The CITY OF MINOT, a municipal corporation of the State of North Dakota, Plaintiff and Respondent,

v.

GENERAL DRIVERS AND HELPERS UNION NO. 74 OF MINOT, North Dakota, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Sylvan Hubrig, as business representative and agent of the said union and Secretary-Treasurer thereof, James Boger, an employee of the City of Minot as steward of said union representing employees of the City of Minot who may be members of said union, and All members of said union who are employees of the City of Minot, as representatives of the class to which they belong, Defendants and Appellants.

No. 8312.

Supreme Court of North Dakota.

May 12, 1966.

Walter O. Burk, Williston, for appellants.

Bosard, McCutcheon & Coyne, Minot, for respondent.

ERICKSTAD, Judge.

This is an appeal by the defendants, General Drivers and Helpers Union No. 74 of Minot, North Dakota, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousenmen and Helpers of America; Sylvan Hubrig, as business representative and agent of the said union and Secretary-Treasurer thereof; James Boger, an employee of the City of Minot as steward of said union representing employees of the City of Minot who may be members of said union; and all members of said union who are employees of the City of Minot, as representatives of the class to which they belong, from a judgment of the District Court of Ward County. For ease of description the defendants will hereafter be referred to as the Teamsters.

Representatives of the City of Minot and the Teamsters met several times during March, April, and May 1965 for the purpose of negotiating a labor contract to go into effect June 1, 1965, when the existing contract was to terminate. In June 1965 a contract acceptable to the negotiators was submitted to the parties. The Teamsters found it acceptable, but the City objected to the inclusion of a dues checkoff provision.

When additional meetings of the representatives met with no success in resolving the City's objection, the Teamsters on June 22, 1965, requested mediation of the dispute pursuant to Chapter 34–11, N.D.C.C. As a result, a representative of the Teamsters and a representative of the City were appointed, and these two met a number of times for the purpose of agreeing on the third member of the board. Three different persons were agreed on, but none of these persons would accept the appointment. On July 16, 1965, before a third member had agreed to serve on the board, the Teamsters went on strike. In addition to remaining away from work, the employee union members also picketed the Public Works Building.

The City then initiated this action, seeking to enjoin the Teamsters from striking, from work stoppage, and from picketing. The complaint alleged, among other things, that the Teamsters unlawfully and illegally and in contravention of Chapter 34–11 caused City employee members of the union to leave their employment and commence picketing; that the picketing was continu-

ing; that as a result the sanitation and refuse trucks of the City were not operating; and that by virtue of these acts the health and safety of the residents of the City were endangered.

The City asked for a temporary restraining order to prohibit the Teamsters from picketing, alleging the picketing resulted in work stoppage causing irreparable damage to the City. An order to show cause why the temporary restraining order should not be made permanent was also requested.

The court accordingly issued a temporary restraining order and an order to show cause why the temporary restraining order should not be made permanent. On July 22, 1965, the day set for a hearing on the order to show cause, the case was continued to permit the parties to make further efforts to form a mediation board.

The mediation board which was ultimately formed rendered a divided report, the majority recommending that the dues checkoff provision be retained in the contract. When this recommendation was not accepted by the City, a hearing was held on August 18, 1965, on the order to show cause why the temporary restraining order should not be made permanent. This resulted in a judgment of the district court permanently enjoining the Teamsters "from further engaging in a strike, work stoppage, or picketing against the City." The Teamsters have appealed from this judgment and demand trial de novo.

The issues on this appeal, as stated by the Teamsters, are whether employees of a city may strike against the city and, if not, whether a permanent injunction may be granted to prohibit such a strike.

All agree that our statutes do not expressly prohibit nor expressly permit public employees to strike.

In support of their contention that public employees may strike, the Teamsters cite the following sections of our Code:

34–09–01. Declaration of public policy. —The public policy of this state is declared to be that a worker shall be free to decline to associate with his fellows and shall be free to obtain employment wherever possible without interference or being hindered in any way, but that he shall also have the right to association and organization with his fellow employees and designation of representatives of his own choosing. A contract made and entered into between an employer of labor and a worker or workers or any agent, bargaining agent or representative of a worker or workers shall be binding and equally enforceable upon both parties to said contract. Elections by secret ballot held to determine the question of who shall be the bargaining representative of a worker or workers or whether a worker or workers shall strike against an employer shall be free and impartial without being influenced by either an employer or worker or any third parties. Secondary boycotts and sympathy strikes are hereby declared to be against public interest and unlawful.

North Dakota Century Code.

34–08–02. Declaration of public policy. —For the purpose of the interpretation of the provisions of this chapter, the public policy of this state is declared to be that a worker of this state shall be free to decline to associate with his fellows, but that he also shall have full freedom of association, self organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free in such matters, as well as in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, from interference, restraint, or coercion by employers of labor or their agents.

North Dakota Century Code.

They say that these statutes are all-inclusive and make no exceptions as to municipal employees.

They argue that there would have been no reason for the enactment of Chapter 34–11, which provides for the mediation of disputes between public employers and employees, if, failing settlement through mediation, the public employees were to be prohibited from striking.

On the ground that Chapter 34–08 applies to a dispute between public employees and the public employer, they contend that the commission of the acts of which the City herein complains, namely, striking and picketing, does not justify the issuance of an injunction. They specifically refer the court to subsections 1 and 5 of § 34–08–05, which read as follows:

34–08–05. Acts which may not be enjoined or restrained.—No court of this state shall issue any restraining order or temporary or permanent injunction in any case involving or growing out of a labor dispute to prohibit any person or persons participating or interested in such dispute from doing, whether singly or in concert, any of the following acts:

1. Ceasing or refusing to perform any work or to remain in any employment relationship;

\* \* \* \* \* \*

5. Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence \* \* \*.

North Dakota Century Code.

They further contend that the City has failed to comply with the provisions of § 34–08–07, which reads as follows:

34–08–07. Basis upon which restraining order or injunction may be issued.— No court of this state shall issue a restraining order or a temporary or permanent injunction in any case involving or growing out of a labor dispute except after hearing the testimony of witnesses in open court in support of the allegations of a complaint made under oath and the testimony offered in opposition thereto, and the granting to opposing parties of the right to cross-examine such witnesses, and except after the court has made and filed with the records in the case findings of fact to the effect that:

1. Unlawful acts have been threatened and will be committed, or have been committed and will be continued, unless restrained;

2. Substantial irreparable injury to complainant's property will follow;

3. As to each item of relief granted, greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief; and

4. Complainant has no adequate remedy at law.

No such restraining order or injunction shall be issued on account of any threat or unlawful act except against a person, association, or organization making the threat or committing the unlawful act or authorizing or ratifying the same with actual knowledge thereof. Every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the complaint filed in such case and as shall be expressly included in the findings of fact.

North Dakota Century Code.

The City concedes that the court did not issue findings of fact affirmatively finding the four items called for under § 34–08–07 but argues that these findings are not essential in a dispute between public employees and a public employer. It points out that the court rendered a memorandum decision in lieu of findings of fact in this case.

As Chapter 34–08 (known as the "Little Norris-LaGuardia Act" after the name of its parent, the federal act popularly known

as the Norris-LaGuardia Act) is almost identical to the federal act, an interpretation of the federal act becomes very important to us.

Incidentally, § 34–08–05, N.D.C.C., is almost identical to Title 29, § 104, U.S.C.A.; and Title 29, § 107, U.S.C.A., contains all of the material provisions found in § 34–08–07, N.D.C.C., except for one which is not applicable to this case. Title 29, § 102, U.S.C.A., and § 34–08–02, N.D.C.C., set forth similar declarations of public policy.

In 1947 the Supreme Court of the United States, in United States v. Mine Workers, considered the applicability of the Norris-LaGuardia Act in a case in which the United States, as an employer, had obtained a temporary order restraining the mine workers union from encouraging the mine workers to interfere with the operation of the mines by strike or cessation of work. The Federal Government was in possession of and operating the mines during a national emergency, pursuant to an executive order issued by the President. In considering the question of the applicability of the provisions of the Norris-LaGuardia Act to the Federal Government, the Court said:

Defendants' first and principal contention is that the restraining order and preliminary injunction were issued in violation of the * * * Norris-LaGuardia Acts. We have come to a contrary decision.

* * * [I]n discussing the applicability of the Norris-LaGuardia Act, we cannot construe the general term "employer" to include the United States, where there is no express reference to the United States and no evident affirmative grounds for believing that Congress intended to withhold an otherwise available remedy from the Government as well as from a specified class of private persons.

* * * * * *

By the Norris-LaGuardia Act, Congress divested the federal courts of jurisdiction to issue injunctions in a specified class of cases. It would probably be conceded that the characteristics of the present case would be such as to bring it within that class if the basic dispute had remained one between defendants and a private employer, and the latter had been the plaintiff below. So much seems to be found in the express terms of §§ 4 and 13 of the Act [parallel to §§ 34–08–01 and 34–08–05, N.D.C.C.] * * *. The specifications in § 13 are in general terms and make no express exception of the United States. From these premises, defendants argue that the restraining order and injunction were forbidden by the Act and were wrongfully issued.

Even if our examination of the Act stopped here, we could hardly assent to this conclusion. There is an old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect. * * *

* * * The purpose of the Act is said to be to contribute to the worker's "full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives * * * for the purpose of collective bargaining * * *" [parallel to § 34–08–02, N.D.C.C.] These considerations, on their face, obviously do not apply to the Government as an employer or to relations between the Government and its employees.

If we examine §§ 4 and 13, on which defendants rely, we note that they do not purport to strip completely from the federal courts all their pre-existing powers to issue injunctions, that they withdraw this power only in a specified type of case, and that this type is a case "involving or growing out of any labor dispute." Section 13, in the first instance, declares a

case to be of this type when it "involves persons" or "involves any conflicting or competing interest" in a labor dispute of "persons" who stand in any one of several defined economic relationships. And "persons" must be involved on both sides of the case, or the conflicting interests of "persons" on both sides of the dispute. The Act does not define "persons." In common usage that term does not include the sovereign, and statutes employing it will ordinarily not be construed to do so. * * *

* * * We hold that in a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them, and the relationship between the Government and the workers is that of employer and employee, the Norris-LaGuardia Act does not apply.

United States v. United Mine Workers, 330 U.S. 258, at 269–289, 67 S.Ct. 677, at 687, 91 L.Ed. 884.

■ Applying the reasoning of the Supreme Court of the United States in *United Mine Workers*, we conclude that our "Little Norris-LaGuardia Act" does not apply in the instant case to prevent the issuance of an injunction to prohibit striking and picketing by the employees of the City. The arguments advanced by the Teamsters which are premised on §§ 34–08–02, 34–08–05, and 34–08–07, N.D.C.C., are therefore found not to prevent the issuance of the injunction in the instant case.

■ The answer to the Teamsters' contention that without the right to strike there would be no justification for the enactment of Chapter 34–11, providing for mediation, is that the purpose of mediation is not the strike nor the picketing, but is the settlement of a labor dispute, and that Chapter 34–11 provides the atmosphere and the procedure for the hearing of grievances and the settlement of disputes, which is ample justification for the existence of the statute.

■ The argument made by the Teamsters that § 34–09–01 does not expressly exempt public employers, we believe, is also answered by the Supreme Court of the United States in *United Mine Workers*.

Let us consider briefly the situation with which the City was confronted when the Teamsters went on strike.

The City of Minot had approximately 220 employees who provided the city with such services as police protection, fire protection, health protection, garbage collection, water and sewer services, airport services, street repair and maintenance, and related services. Approximately 70 of the City's employees were in the bargaining unit represented by the Teamsters. These employees were mainly laborers, truck drivers, and heavy equipment operators. Eighteen or nineteen were in the street department. The street department maintained and repaired the city's streets, which extended some 200 miles within the city. All the city's pedestrian cross walks, traffic signals, electric semaphore signals, street markers, signs, and emergency barricades were maintained by the street department. The City conducted extensive street cleaning operations.

It operated five street sweepers, four of which were in use 8 hours per day, and two of which were in use 16 hours per day from early spring to late fall. The sweepers covered the residential areas of the city approximately once every ten days. They were each 8 feet wide and had to make several swathes to cover a street.

The City had more than 8,000 individual residential garbage accounts, for which it was the sole collector. A fee of $1.25 per month was charged to each account, which entitled the account to two garbage pickups and one trash pickup weekly. The City employed four 16-cubic-yard compacter garbage trucks and one or two trash trucks for the collection of garbage and trash. The total hauling capacity of each of the compacter trucks was far greater than 16 cubic

yards because of each truck's pressure compaction capability. The commercial areas of the city were serviced by private licensed commercial haulers. The City maintained a sanitary landfill operation for the disposal of garbage collected by its trucks and the privately operated trucks. The garbage was dumped by the trucks, compacted by crawler tractors, and covered with a layer of dirt each day. The landfill areas were somewhat inaccessible and were reached by a road, the location of which changed continually because of the nature of the covering operation, which kept changing the dumping point. The access road was suitable for the trucks but was quite unsatisfactory for passenger cars. Approximately 250 compacted cubic yards of garbage were deposited at the landfill each day.

There were 17 employees in the City's garbage department, and all of them except the supervisor were represented by the union. On the morning the strike was called, only three men from the street department and one man from the garbage department reported for work. Those who reported for work were sent home because they could not efficiently operate either of the departments. The maintenance or emergency crews failed to report for work at the city's sewage plant, although the operational crews reported for work. This was also the case at the city's water plant. The airport was not picketed, and all of the airport employees continued to work.

■ Under these circumstances, it was imperative that the trial court issue its temporary restraining order enjoining the union from striking, work stoppage, and picketing, and that the temporary order be made permanent. It is our view that the injunctive relief was necessary to prevent obstruction by the Teamsters of the governmental function of the City.

■ Further, we believe that the strike and the picketing in its support by the city employees were illegal.

In 1965 the Supreme Court of Illinois had occasion to consider questions similar to those raised on this appeal. In that case an action was brought to enjoin the custodial employees of certain public schools from conducting a strike against the school board and from picketing. In granting the injunction the court said:

Although this is a case of first impression in a reviewing court of this jurisdiction, it is, so far as we can ascertain, the universal view that there is no inherent right in municipal employees to strike against their governmental employer, whether Federal, State, or a political subdivision thereof, and that a strike of municipal employees for any purpose is illegal. [Citations omitted.] The underlying basis for the policy against strikes by public employees is the sound and demanding notion that governmental functions may not be impeded or obstructed, as well as the concept that the profit motive, inherent in the principle of free enterprise, is absent in the governmental function.

Board of Ed. of Community Unit Sch. Dist. No. 2 v. Redding, 32 Ill.2d 567, 207 N.E.2d 427, at 430.

■ In addition to supporting our conclusion that the Teamsters in the instant case may be enjoined from conducting a strike against the City, it also supports our view that a strike and picketing in support thereof by municipal employees are illegal.

The picketing in the Illinois case and in the case before us was peaceful. Nonetheless, the Illinois court held it enjoinable:

The picketing here, though peaceful, was for the purpose of fostering and supporting an unlawful strike against a governmental employer and, being for an unlawful purpose, should have been enjoined for this reason alone. Apart from this, however, the effect of the influences

exerted by the picketing was to impede and obstruct a vital and important governmental function—the proper and efficient education of our children—making its curtailment necessary to protect the patently overriding public interest.

Board of Ed. of Community Unit Sch. Dist. No. 2 v. Redding, supra, 207 N.E. 2d at 432.

It cannot be denied that the proper and efficient collection of garbage and the maintenance of city streets are in the public interest.

That picketing for an illegal purpose may be enjoined has been previously held by this court in the case of Minor v. Building and Construction Trades Council, 75 N.W.2d 139 (N.D.1956). In the syllabus of that case we said:

> The purpose of the picketing in the case at bar was to force the plaintiffs to establish a union shop which would result in making the employees join the union whether they wanted to or not or lose their employment. Picketing for such purpose was illegal and may be enjoined.

A similar viewpoint is indicated by the following excerpts from a decision rendered by the Supreme Court of Errors of the State of Connecticut in 1951:

> Few cases involving the right of unions of government employees to strike to enforce their demands have reached courts of last resort. That right has usually been tested by an application for an injunction forbidding the strike. The right of the governmental body to this relief has been uniformly upheld. It has been put on various grounds: public policy; interference with governmental function; illegal discrimination against the right of any citizen to apply for government employment (where the union sought a closed shop). The following cases do not

necessarily turn on the specific right to strike, but the reasoning indicates that, if faced with that question, the court would be compelled to deny that right to public employees. * * * The court puts the matter succintly in [Miami Water Works Local No. 654 v. City of Miami, 157 Fla. 445, 26 So.2d 194, 165 A.L.R. 967]: "While strikes are recognized by the statute to be lawful under some circumstances, it would seem that a strike against the city would amount, in effect, to a strike against government itself—a situation difficult to reconcile with all notions of government."

\* \* \* \* \* \*

In the American system, sovereignty is inherent in the people. They can delegate it to a government which they create and operate by law. They can give to that government the power and authority to perform certain duties and furnish certain services. The government so created and empowered must employ people to carry on its task. Those people are agents of the government. They exercise some part of the sovereignty entrusted to it. They occupy a status entirely different from those who carry on a private enterprise. They serve the public welfare and not a private purpose. To say that they can strike is the equivalent of saying that they can deny the authority of government and contravene the public welfare. * * *

Norwalk Teachers' Ass'n v. Board of Education, 138 Conn. 269, 83 A.2d 482, at 484–485, 31 A.L.R.2d 1133.

The judgment of the trial court enjoining the Teamsters from striking, work stoppage, and picketing is affirmed.

TEIGEN, C. J., and STRUTZ, MURRAY and KNUDSON, JJ., concur.