ANDERSON FEDERATION OF TEACHERS LOCAL 519 *v.*
SCHOOL CITY OF ANDERSON ET AL.

[No. 868S121. Filed October 1, 1969. Rehearing denied January 19, 1970.]

*Paul E. Schrenker* and *Henry P. Schrenker*, of Anderson, and *Frank E. Spencer* and *Robert Robinson*, of Indianapolis, for appellant.

*William Byer* and *Robert W. Miller,* of Anderson, for appellee.

GIVAN, J.—On May 6, the Superior Court of Madison County found the appellant, Anderson Federation of Teachers, Local 519, in contempt of court for the violation of a restraining order which had been issued without notice on the 2nd day of May, 1968, directing the appellant, teachers' union, and its members to refrain from picketing and striking against the appellee school corporation. It is from this judgment of contempt that this appeal is taken.

The appellant is an organization of public school teachers employed by the appellee.

The appellee is a municipal corporation organized under the statutes of this state for the purpose of operating the public schools within the boundaries of the School City of Anderson, Indiana.

In the spring of 1968, the appellant and the appellees entered into negotiations concerning salary schedules for the following year. These negotiations apparently were not satisfactory to the appellant for on May 1, 1968, the appellant instituted a strike against the school corporation and established picket lines at the various schools operated by appellee. Evidence discloses that school children were unloaded in the public streets because of the presence of the picket lines. It was this action of picketing by the appellant which precipitated the temporary restraining order issued on May 2, 1968, and it was the continuation of this activity without regard for the restraining order upon which the trial court based its judgment after a hearing on May 6, 1968, that the appellant was in contempt of court for violating the restraining order.

The trial court was in all things correct in its finding and judgment of contempt of court.

It is the contention of the appellant that Indiana's "Little Norris-LaGuardian Act," also known as the anti-injunction statute, the same being Burns' Ind. Stat. Ann. § 40-501, *et seq.*, is applicable in this case. This act prohibits the issuance of restraining orders and injunctions in matters involving labor disputes between unions and private employers. We do not agree with the appellant that this act is applicable to disputes concerning public employees. The overwhelming weight of authority in the United States is that government employees may not engage in a strike for any purpose.

The Supreme Court of the United States clearly enunciated the proposition that public employees did not have a right to strike and that the injunctive processes might properly be used to prevent or halt such strikes in the case of *United States v. United Mine Workers* (1947), 330 U. S. 258, 91 L. Ed. 884, 67 S. Ct. 677. This case has never been overruled or modified. The decision was later followed by Justice Goldsborough of the United States District Court for the District of Columbia in the case of *United States v. Brotherhood of Locomotive Engineers* (1948), 79 F. Supp. 485, certiorari denied 335 U. S. 867, 93 L. Ed. 412, 69 S. Ct. 137.

In the *United Mine Workers* case it was contended that the specifications in Section 13 of the statute are in general terms and make no express exception of the United States, thus it was argued the restraining order and injunction were forbidden by the act and wrongfully issued. In dealing with this argument the Supreme Court of the United States, beginning at page 272 of the official opinion, stated:

". . . There is an old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect. It has been stated, in cases in which there were extraneous and affirmative reasons for believing that the sovereign should also be deemed subject to a restrictive statute, that this rule was a rule of construction only. Though that may be true, the rule has been invoked successfully in cases so closely similar to the present one,

and the statement of the rule in those cases has been so explicit, that we are inclined to give it much weight here. Congress was not ignorant of the rule which those cases reiterated; and, with knowledge of that rule, Congress would not, writing the Norris-LaGuardian Act, omit to use 'clear and specific [language] to that effect' if it actually intended to reach the Government in all cases."

The Court, however, did not rely entirely upon the above proposition, but, in addition, went on to observe as follows:

"But we need not place entire reliance in this exclusionary rule. Section 2, 29 USCA § 102, 9 FCA title 29, § 102, which declared the public policy of the United States as a guide to the Act's interpretation, carries indications as to the scope of the Act. It predicates the purpose of the Act on the contrast between the position of the 'individual unorganized worker' and that of the 'owners of property' who have been permitted to 'organize in the corporate and other forms of ownership association,' and on the consequent helplessness of the worker 'to exercise actual liberty of contract . . . and thereby to obtain acceptable terms and conditions of employment.' The purpose of the Act is said to be to contribute to the worker's 'full freedom of asociation, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives . . . for the purpose of collective bargaining. . . .' These considerations, on their face, obviously do not apply to the Government as an employer or to relations between the Government and its employees."

We are in total accord with the above language and hold that it is equally applicable to the Indiana statute.

This same proposition has been followed generally in most of the other state jurisdictions where it has been repeatedly held that strikes by public employees are or should be prohibited and that injunctions should be granted to halt or prevent them. For reference see the following cases: *School City of Pawtucket v. Pawtucket Teachers Alliance* (1966), 101 R. I. 243, 221 A. 2d 806; *Minneapolis Federation of*

*Teachers v. Obermeyer et al.* (1966), 275 Minn. 347, 147 N. W. 2d 358; *City of Minot v. General Drivers and Helpers Union* (1966), N. D., 142 N. W. 2d 612; *Board of Education of Community Unit School District No. 2 v. Redding* (1965), 32 Ill. 2d 567, 207 N. E. 2d 427; *New Jersey Turnpike Authority v. American Federation et al.* (1964), 83 N. J. Super. 389, 200 A. 2d 134; *Donevero v. Jersey City Incinerator Authority* (1962), 75 N. J. Supr. 217, 182 A. 2d 596; *South Atlantic & Gulf Coast District of International Longshoremen's Association. v. Harris County* (1962), Tex., 358 S. W. 2d 658; *Hansen v. Commonwealth* (1962), 344 Mass. 214, 181 N. E. 2d 843; *Port of Seattle v. Int'l Longshoremen's Union* (1958), 52 Wash. 2d 317, 324 P. 2d 1099; *City of Pawtucket v. Pawtucket Teachers Alliance* (1958), 87 R. I. 364, 141 A. 2d 624; *City of Manchester v. Manchester Teachers Guild* (1957), 100 N. H. 507, 131 A. 2d 59; *City of Alcoa v. Int'l. Brotherhood of Electrical Workers* (1957), 203 Tenn. 12, 308 S. W. 2d 476; *International Brotherhood of Electrical Workers v. Grand River Dam Authority* (1956), Okla., 292 P. 2d 1018; *City of Detroit v. Division 26 et al.* (1952), 332 Mich. 237, 51 N. W. 2d 228; *Norwalk Teachers Association v. Board of Education* (1951), 138 Conn. 269, 83 A. 2d 482, 31 A. L. R. 2d 1133; *City of Los Angeles v. Los Angeles Building and Trades Council* (1949), 94 Cal. App. 2d 36, 210 Pac. 2d 305; *Miami Waterworks Local 654 v. City of Miami* (1946), 157 Fla. 445, 26 So. 2d 194.

We find only one case where an injunction to prevent a pending strike of public employees was denied. That case was *Board of Education v. Public School Employees Union* (1951), 233 Minn. 141, 45 N. W. 2d 797. That case, however, was overruled in 1966 by the Supreme Court of Minnesota in *Minneapolis Federation of Teachers v. Obermeyer, supra.*

The Indiana Continuing Legal Education Forum in 1968 circulated a publication entitled MUNICIPAL EMPLOYEE NEGOTIATIONS AND STRIKES in which they point out

that almost without exception the state and federal courts hold that strikes by public employees are illegal.

The publication also quotes from a letter written by President Franklin D. Roosevelt to the President of the National Federation of Federal Employees on August 16, 1937, in which he said:

"Particularly, I want to emphasize my conviction that militant tactics have no place in the functions of any organization of Government employees . . . A strike of public employees manifests nothing less than intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable."

In a New York Supreme Court case Justice Emilio Nunez in granting an injunction against striking teachers made the following observation:

"Upon the signing of the Condon-Wadlin Act, Governor Dewey stated, in part, that 'Every liberty enjoyed in this nation exists because it is protected by a government which functions uninterruptedly. The paralysis of any portion of government could quickly lead to the paralysis of all society. Paralysis of government is anarchy and in anarchy liberties become useless.' " *Board of Education of the City of New York v. Albert Shanker and United Federation of Teachers, Local 2,* Supreme Court (1967), 283 N.Y. S.2d 548, 552.

We thus see that both the federal and state jurisdictions and men both liberal and conservative in their political philosophies have uniformly recognized that to allow a strike by public employees is not merely a matter of choice of political philosophies, but is a thing which cannot and must not be permitted if the orderly function of our society is to be preserved. This is not a matter for debate in the political arena for it appears fundamental, as stated by Governor Dewey, public strikes would lead to anarchy, and, as stated by President-

dent Roosevelt, the public strike "is unthinkable and intolerable."

The Madison Superior Court is, therefore, in all things affirmed.

Arterburn, J., concurs; Hunter, J., concurs with statement; DeBruler, C. J., dissents with opinion in which Jackson, J., concurs.

HUNTER, J.—Heretofore I announced my determination not to participate in this case by reason of the fact that the issues presented involved litigation in the City of Anderson, Indiana, my place of residence. However, my sense of judicial responsibility and duty now impels me to do so, because of the gravity of the legal issues of public policy in the area of public education.

Therefore, I wholeheartedly concur in the opinion of Judge Givan in this case.

DISSENTING OPINION.

DEBRULER, C. J.—I dissent from the opinion of the majority for two reasons:

I. The majority opinion offers absolutely no justification for its holding that every strike by any public employees, including teachers, is illegal and, therefore, enjoinable regardless of how peaceful and non-disruptive the strike is.

II. Indiana has an anti-injunction statute which is applicable to this case. Since the trial court did not follow the procedures required by that statute, it had no jurisdiction to issue a temporary restraining order or injunction without notice or hearing, or to find the teachers union guilty of contempt without a jury trial.

I.

This teachers' strike was completely peaceful and minimally disruptive of the public service rendered by the schools. Only

a small percentage of the public school teachers participated in the strike, the schools were never closed by the strike, and there was sufficient staff to insure that the classes quiet, seated and at work. The picketing which accompanied this strike was at all times peaceful, non-threatening, and at no time endangered the health or safety of the school or the community. The non-striking teachers and students entered and left the building freely.

In spite of this the majority labels this strike "illegal" and states that, therefore, the injunctive process may be used to halt it. The strike is called illegal because it is in violation of an alleged public policy of this State against all strikes by public employees. However, there has never been such a public policy in this State and there was none in May, 1968, when the teachers in this case went on strike. Our General Assembly has never declared such a public policy, on the contrary, the only legislation that can be interpreted to cover this subject is the anti-injunction statute discussed under Part II of this dissenting opinion, which runs directly counter to the majority opinion.

In the absence of any legislative guidelines, formulated after thorough public discussion and debate, the majority suddenly declares that there is an absolute prohibition against any strike by any group of public employees, no matter how peaceful or nondisruptive the strike may be.

The majority offers no *argument* to show why this Court should make such a declaration of policy. They merely set out a list of cases from other jurisdictions and quotes from two well-known politicians to the effect that *they* believed strikes by public employees were unthinkable and led to anarchy. Nowhere does the Court descend from these useless generalities and deal with the facts in the case before us.

The court decisions cited by the majority from other jurisdictions are not authority in Indiana except to the extent the reasoning therein is persuasive to this Court. The per-

tinent cases are those where, in the absence of any legislation, the appellate courts have declared the right to enjoin strikes by public employees, even though the strike is peaceful and minimally disruptive to the general community. I have read all the cases cited by the majority, and on this point I have found none whose reasoning supports a *per se* rule against strikes by public employees. All of the cases rely on the same arguments, and I will examine the main ones to show their weaknesses.

(1) "The terms of employment are not subject to bargaining and strike pressure because they are set by the legislative body and are not within the discretion of the agency which is the employer."

This assumes an old-fashioned, out-dated view of the purpose and value of collective bargaining. In Indiana the governing boards of the school corporations have a wide discretion in the allocation of the resources which are budgeted to them. In the case now before us, the appellee has bargained with appellant over salary schedules at least since 1952. Besides, there are many issues about which employees are anxious to bargain other than wages, which are within the discretion of the agency employer. This is shown by a policy statement by appellee, in effect prior to and during the strike which reads in part as follows:

> "Be it resolved, that the Board of School Trustees of the School City of Anderson will professionally negotiate with the Anderson Federation of Teachers with regards to employment, salary schedules, grievance procedures, working conditions and administration policies."

All employees have a legitimate interest in establishing fair grievance procedures to control arbitrary and discriminatory dismissal or discipline. Teachers especially, as professionals, have a wide range of concerns other than purely monetary. They do and ought to have a strong interest in the establishment of the priorities in the allocation of the total school budget; they are interested in the details of the teacher trans-

fer programs designed to promote integrated faculties; they are interested in the emphasis and techniques to be used in furnishing special services to underprivileged and ghetto children; they have an interest in controlling how much of their time must be given up to patrolling rest rooms searching out smokers, or collecting tickets at basketball games; they have an interest in the quality of texts and audio-visual materials to be used; they have an interest in the whole question of the substitute teacher system. The local governing boards do have discretion in these areas in addition to wide discretion with reference to salaries, job classification, job requirements, etc. The existence of this discretion means that there is something for teachers and local school boards to bargain about. It also means that there is a wide scope for arbitrary and unfair actions by those boards which can be avoided only if the teachers have the effective means to pressure the boards into good faith bargaining on the issue. If this argument against the right of all public employees to strike ever held water, it certainly does not any longer.

(2) "To say that public employees can strike is to say that they can deny the authority of government."

It must be kept in mind that the local governing boards of school corporations have a great deal of *discretion* over the terms and conditions of employment of teachers. Any decision within this discretionary area is authorized by the government and, therefore, obviously does not deny the authority of government. The teachers seek to compel choices within that discretionary area. They do *not* seek to destroy the body politic or pressure employers into violating their statutory duties.

In addition, I think the entire community benefits when the government recognizes the right in its employees and citizens to compel the human agents of that government to behave reasonably and fairly towards all those with whom they deal.

(3) "A strike by public employees is a strike against government itself, a situation so anomalous as to be unthinkable."

This is not a rational argument at all but a technique for avoiding dealing with the merits of the issue. This argument indicates a limitation in the thinker not attributable to the subject matter. In the case of a peaceful strike and no major disruption of the community, I find it very easy to think of a strike against the sovereign *and* to justify it. In fact, I find it unthinkable that any sovereign worthy of the name would strive to remain insulated from all pressures to act fairly and decently, without arbitrariness, towards its employees. The conflict of real social forces cannot be solved by the invocation of magical phrases like "sovereignty".

(4) "Public employees occupy a status entirely different from private employees because they are agents of the government serving a public purpose and a strike by them contravenes the public welfare and results in paralysis of the society."

First, I think we should note the basic similarities between the two categories of employees. They both involve people working for wages and seeking some control over their employment conditions. The potential for arbitrary and discriminatory practices against employees are the same. In both cases there is pressure on the employer to pay as little as possible and still retain the personnel. In both cases the employer has some areas of discretion which allow for bargaining with the employees.

Second, I believe that to avoid being in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution the dichotomy between public and private employees must have a rational basis in light of the purpose of the no-strike prohibition. *Rinaldi v. Yeager* (1966), 384 U. S. 305, 86 S. Ct. 1497, 16 L. Ed. 2d 577. If some strikes by workers within the category of public employees would

not appreciably disrupt the community or create anarchy, then there is no justification for treating those public employees differently than private employees, and, therefore, no justification for a *per se* rule against strikes by public employees. To justify such a prohibition against every strike by any public employees the results of a strike by such employees must be different from and more disruptive than a strike by private employees. That such is not the case can be easily demonstrated.

(a) There is no difference in impact on the community between a strike by employees of a public utility and employees of a private utility; nor between employees of a municipal bus company and a privately owned bus company; nor between public school teachers and parochial school teachers. The form of ownership and management of the enterprise does not determine the amount of disruption caused by a strike of the employees of that enterprise. In addition, the form of ownership that is actually employed is often a political and historical accident, subject to future change by political forces. Services that were once rendered by public enterprise may be contracted out to private enterprise, and then by another administration returned to the public sector.

(b) It seems obvious to me that a strike by some private employees would be far more disruptive of the society than the peaceful teachers' strike involved in this case, *e.g.*, the truck drivers who deliver milk to the cities, the factory workers who work in defense plants, construction workers on missile and space launching sites, agricultural workers, etc.

(c) The state and municipal governments perform their many functions through a large number of different agencies of varying importance. The temporary cessation of work in one of those agencies will not *necessarily* interfere with the rest of the service. It is naive to think that *every* strike by *any* public employees will upset the whole operation of government.

Does the majority seriously believe that a strike by employees, of municipal golf courses would result in anarchy? What of city parking lot attendants? What about janitors? What about referees at the high school basketball games? In this case there was absolutely no finding that the strike was unduly disrupting the community or causing social chaos.

Neither may the constitutional right of public employees to be free from invidious discrimination by the State be diminished as a price of public employment. In *Garrity v. New Jersey* (1967), 385 U. S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562, the United States Supreme Court said:

"We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights. ...

"There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." 385 U.S. at 500.

In *Keyishian v. Board of Regents of New York* (1967), 385 U. S. 589, 87 S. Ct. 675, 17 L. Ed. 2d 629, that same Court said:

"However, the Court of Appeals for the Second Circuit correctly said in an earlier state of this case, '... the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected; *Keyishian v. Board of Regents*, 345 F.2d 236, 239. Indeed, that theory was expressly rejected in a series of decisions following Adler. See *Wieman v. Updegraff*, 344 U.S. 183, 97 L. Ed. 216, 73 S. Ct. 215; *Slochower v. Board of Education*, 350 U.S. 551, 100 L. Ed. 692, 76 S. Ct. 637; *Cramp v. Board of Public Instruction, supra; Baggett v. Bullitt, supra; Shelton v. Tucker, supra; Speiser v. Randall, supra;* see also *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L.Ed.2d 796, 77 S. Ct. 752, 64 A.L.R.2d 288; *Torcaso v. Watkins*, 367 U.S. 488, 6 L.Ed.2d 982, 81 S. Ct. 1680. In *Sherbert v. Verner*, 374 U.S. 398, 404, 10 L.Ed.2d 965, 971, 83 S. Ct 1790, we said: 'It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.' " 385 U.S. at 605.

It is clear then that the mere existence of some difference between public and private employees cannot justify an absolute strike prohibition.

It is true that a strike by public employees may result in some amount of disruption of the agency for which they work. In the absence of legislation dealing with this subject we believe that it is a judicial function to determine whether the amount of the disruption of the service is so great that it warrants overriding the legitimate interests of the employees in having effective means to insure good faith bargaining by the employer. This is a minimum requirement before a court can declare a strike by public employees illegal.

This view is supported by *School District for City of Holland v. Holland Education Association* (1968), 380 Mich. 314, 157 N. W. 2d 206. In that case the Supreme Court of Michigan reversed the issuance of an injunction against a teachers' strike on the ground that the only harm shown was that the schools would be closed and would not open the fall term on time. The court said:

> "We here hold it is insufficient merely to show that a concert of prohibited action by public employees has taken place and that *ipso facto* such a showing justifies injunctive relief. We so hold because it is basically contrary to public policy in this State to issue injunctions in labor disputes absent a showing of violence, irreparable injury, or breach of the peace. For a recent discussion of this question, see *Cross Company v. United Automobile, Aircraft & Agricultural Implement Workers of America Local No. 155 (AFL-CIO)*, 371 Mich. 184, 123 N.W.2d 215. We further so hold because such an interpretation of the act would as before noted raise a serious constitutional question.
>
> "We indicated earlier that we deal with a meager record. No testimony was taken on the hearing upon the application for the temporary injunction. Simply put, the only showing made to the chancellor was that if an injunction did not issue, the district's schools would not open, staffed

by teachers on the date scheduled for such opening. We hold such showing insufficient to have justified the exercise of the plenary power of equity by the force of injunction." 157 N..W2d at 210.

In our case there was was not even that much harm shown.

I think it is a very unwise policy to allow a trial court to enjoin a peaceful strike, in the absence of any way to insure that the underlying dispute will be discussed and settled amicably. To prohibit a strike in a context where this amounts to ending any pressure on the employer to bargain in good faith with representatives of the employees is to invite arbitrary action by the employer, illegal strikes, violence, and bitter feelings which may do long lasting damage to the community.

Indiana needs a comprehensive labor relations act which would provide a mechanism to help settle labor disputes involving both public and private employees, without recourse to a strike.[1] It is obvious the courts cannot create this machinery. It is equally obvious that the Court should not create an apparent substitute in the form of a *per se* rule against peaceful strikes by public employees regardless of the impact of the strike, when this substitute is wholly inadequate and seriously misleading as to its effects.

## II.

The Indiana anti-injunction statute, Acts of 1933, ch. 12, the same being Burns' Ind. Stat. Ann. §§ 40-501 to 40-514, sets out procedures which must be followed by a trial court in order to get jurisdiction to enjoin a strike. The statute reads in part:

"No court of the state of Indiana, as herein defined, shall have jurisdiction to issue any restraining order or

---

1. Getman, Indiana Labor Relations Law: The Case for a State Labor Relations Act, 42 Ind. L. J. 77 (1966) ; Whitney, Indiana Labor Relations Law.

temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this act. . . ." Burns' § 40-501

"No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of finding of facts made and filed by the court in the records of the case prior to the issuance of such restraining order or injunction. . . ." Burns' § 40-509

"In all cases arising under this act in which a person shall be charged with contempt in a court of the state of Indiana (as herein defined), the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and county wherein the contempt shall have been committed. . . ." Burns' § 40-511

These and other procedural requirements are applicable if the case is one "involving or growing out of a labor dispute." On the face of it, this statute clearly applies to this controversy. Appellant is a teachers' union composed of employees of appellee which has regularly bargained with the appellee-employer at least since 1952 over various terms and conditions of their employment. The parties were in the midst of negotiations over the next year's employment contract when the strike occurred. A policy statement by appellee, which was in effect during the period of time involved here, reads in part as follows:

"Be it resolved, that the Board of School Trustees of the School City of Anderson will professionally negotiate with the Anderson Federation of Teachers with regards to employment, salary schedules, grievance procedures, working conditions and administrative policies."

I can think of no better way to describe this controversy than as a classic labor dispute.

The anti-injunction statute defines a labor dispute as:

"(c) The term 'labor dispute' includes any controversy concerning terms of conditions of employment, or concerning

the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." Burns' § 40-513(c)

Burns' § 49-513(a) sets out several ways in which a case will be held to "involve or grow out of a labor dispute", among which are:

> "(a) A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same . . . occupation . . . or who are employees of the same employer, or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or association of employers and one or more employees or association of employees . . . or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined)."

The definitions are in the disjunctive, and, therefore, any one of them, if applicable, would qualify this case as one "involving or growing out of a labor dispute". Obviously they are all applicable.

When we look to common usage and to the definitions in the statute itself, it appears that this controversy is within the anti-injunction statute.

Although there are no cases in Indiana on this point, Indiana has a statute which tells us how to construe this statute. 2 R. S. 1852, ch. 17, § 1, the same being Burns' Ind. Stat. Ann. § 1-201 states:

> "Statutes, how construed.—The construction of all statutes of this state shall be by the following rules, unless such construction be plainly repugnant to the intent of the legislature or of the context of the same statute:
>
> "First. Words and phrases shall be taken in their plain, or ordinary and usual, sense. But technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."

When the words in Burns' § 40-513, *supra*, are taken in their plain, or ordinary and usual sense, they obviously apply to this controversy. Neither is this construction plainly repugnant to the intent of the Legislature or the context of this statute.

Another statute which leads to this conclusion is 2 R.S. 1852, ch. 17, § 2, the same being Burns' Ind. Stat. Ann. § 1-202, which states:

> "The foregoing rules of construction and definitions of terms shall be in addition to, and part of those adopted in the Code of Civil Practice, and, together with those, shall apply to all statutes or acts of the legislature."

Indiana Acts of 1881 (Spec. Sess.), ch. 38, § 857, the same being Burns' Ind. Stat. Ann. § 2-4701, in the Civil Code states in part:

> "In the construction of this act, the following rules shall be observed, when consistent with the context:
>
> . . . . .
>
> "[Fifth] The word 'person' extends to bodies politic and corporate."

This means that the word "persons" as used in Burns' § 40-513(a), *supra,* does apply to the state and especially to *school corporations.*

In further support of this position is the following opinion of the Attorney General referring to the anti-injunction statute:

> "The 'employer' in a 'labor dispute' is not defined, and *there is no language which limits the application of the statute or its declared public policy only to employees in private industry.* No consideration is given in the 1944 Opinion to the fact that authorizing the organization of employees while permitting their elected representatives to be totally ignored by a public employer would be an exercise in futility, at best, and *could not have been contemplated by the General Assembly when it enacted that statute in 1933.*" (Emphasis added.) 1966 O.A.G. 151

Thus, I think there is no doubt that the Indiana anti-injunction statute is applicable in this case.

The majority argues that the trial court was correct in holding that the anti-injunction statute did not apply, relying on *United States v. United Mine Workers of America* (1947), 330 U. S. 258, 67 S. Ct. 677, 91 L. Ed. 884.

In that case, due to dangerous conditions at home and abroad in 1946, the United States government had by executive order taken over the coal mines and made the miners "public employees". The union threatened to strike, and to avert a national emergency the United States obtained, without notice or hearing, a temporary restraining order against the strike. The union refused to obey the order and was held in contempt of court. On appeal the union argued that the temporary restraining order was invalid because it was not issued in compliance with the federal anti-injunction act, commonly called the Norris-LaGuardia Act. The Supreme Court held that the federal anti-injunction act did not apply to a strike by public employees against the United States.

There are no cases in Indiana construing the Indiana version of the anti-injunction statute where public employees have been involved. Since the federal act was the model for the Indiana statute, the majority deems that case, construing the federal act, controlling in the case before us.

A federal case construing a federal statute is, of course, not binding authority on any state. As was shown above, the Indiana statutes on construction clearly make the Indiana anti-injunction statute applicable to this strike by public school teachers. With all due deference to the United States Supreme Court, I do not find the reasoning of that case persuasive enough to cause us to deny the clear applicability of the Indiana anti-injunction statute. There are several reasons for this.

(1) In *United States v. United Mine Workers of America,*

*supra,* the Supreme Court relied largely on a rule of statutory construction which the court stated as follows:

> "There is an old and well-known rule that statutes which in general terms divest preexisting rights or privileges will not be applied to the sovereign without express words to that effect." 330 U.S. at 272

Indiana has no such general rule of construction to be followed in all cases and the majority cites no Indiana cases on this point. The statutes setting out the rules of construction discussed above do not contain such a rule and in fact show a contrary intent.

In *United States v. California* (1936), 297 U. S. 175, 56 S. Ct. 421, 80 L. Ed. 567, the Supreme Court commented on the rule saying:

> "The presumption is an aid to consistent construction of statute of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." 297 U.S. at 196

I believe the purpose of the Indiana anti-injunction statute is not in doubt, and is fairly inferred by using the statutes on construction cited above, being Burns' §§ 1-201, 1-202, and 2-4701. I can only conclude that the Legislature knew of those statutes and, in passing the anti-injunction statute, intended it to apply to labor disputes involving public employees.

(2) The anti-injunction statute sets out conditions to be fulfilled prior to the enforcement of any right the complainant might have. A statute of this type has been held to bind the State even though it was *not expressly referred* to *in the statute. Bahr v. Zahm* (1941), 219 Ind. 297, 37 N. E. 2d 942. There the Court held that the State was barred from filing a claim against a decedent's estate because it had not been filed within the thirty days before final settlement as

required by the then existing statute. The State relied on a statute declaring that the statute of limitations would not bind the State. The Court applied the probate statute to the State, in spite of the fact that the statute did not expressly refer to the State, saying:

> "We do not know of any statute or rules of law that relieves the state of Indiana from the obligation to perform conditions precedent upon which the enforcement of a right of action is made to depend." 219 Ind. at 302

I believe *Bahr v. Zahm, supra,* applies to this case. The anti-injunction statute sets out conditions precedent to the enforcement of a right of action. As in *Bahr* the sovereign is not expressly mentioned, and as in *Bahr* it does not have to be in order to be bound by it.

(3) The rule of statutory construction relied on by the Supreme Court had the same origin as the doctrine of "sovereign immunity" in tort law; namely, in the relation between the Crown and Parliament in Eighteenth Century England.[2] The rule that in the absence of an express declaration the sovereign is not bound by the laws governing private parties has long been used to defeat government liability for the negligent acts of its employees. This outmoded doctrine has been widely criticized for its unjust results and irrational basis.[3] It has been on the decline in Indiana,[4] and it has been totally abandoned in the case of municipal corporations. *Brinkman v. Indianapolis* (1967), 141 Ind. App. 662, 231 N. E. 2d 169. In the *Brinkman* case the Court held

---

2. Hargrove v. Town of Cocoa Beach (Fla. 1957), 96 So. 2d 130.

3. Davis, Tort Liability of Government Units, 40 Minn. L. Rev. 752 (1956); LeFlar & Kantrowitz, Tort Liability of the States, 29 N.Y.U. L. Rev. 1363 (1954); note, Governmental Tort Liability in Indiana, 23 Ind. L.J. 468 (1948); Borchard, Government Liability in Tort, 34 Yale L.J. 1, 129, 229 (1924); 36 Yale L.J. 757, 759, 1039 (1926).

4. Note, The Decline of Sovereign Immunity, 36 Ind. L.J. 223 (1961).

that the City of Indianapolis was liable for the negligent acts of its police employees on the theory of *respondeat superior*. The Court discarded the useless distinction between proprietary and governmental functions and relied on the opinions in *Louisville v. Chapman* (Ky. 1967), 413 S. W. 2d 74, and *Hargrove v. Town of Cocoa Beach* (Fla. 1957), 96 So. 2d 130. Quoting from the latter case the Court said:

> " 'To continue to endow this type of organization with sovereign divinity appears to us to predicate the law of the Twentieth Century upon an Eighteenth Century anachronism.' " 231 N.E.2d at 172

The reasons for discarding sovereign immunity in tort law are equally valid for discarding sovereign immunity in the area of statutory construction. We cite this as a clear example of the modern trend to apply to the State and its subdivisions the same laws and standards as are applied to private parties. If there is a reason why this should not be done, the Legislature can expressly make the exception.

(4) The Supreme Court in construing the federal act also relied on the argument that the word "persons" did not apply to the sovereign.

> "Section 13, in the first instance, declares a case to be of this type when it 'involves persons' or 'involves any conflicting or competing interests' in a labor dispute of 'persons' who stand in any one of several defined economic relationships. And 'persons' must be involved on both sides of the case, or the conflicting interests of 'persons' on both sides of the dispute. The Act does not define 'persons'. In common usage that term does not include the sovereign, and statutes employing it will ordinarily not be construed to do so. Congress made express provision, Rev. Stat. § 1, 1 U.S.C.A. § 1, 2 FCA title 1, § 1, for the term to extend to corporations, and in § 13 of the Act itself for it to extend to associations. The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them." 330 U.S. at 275.

As we have shown above, this is definitely not the case in Indiana. Burns' § 2-4701, *supra,* in the Civil Code states in part:

"In the construction of this act, the following rules shall be observed, when consistent with the context:

. . . . .

"[Fifth] The word 'person' extends to bodies politic and corporate."

This is applicable to the anti-injunction statute through Burns' § 1-202, *supra:*

"The foregoing rules of construction and definitions of terms shall be in addition to, and part of those adopted in the Code of Civil Practice, and, together with those, shall apply to all statutes or acts of the legislature."

On the reasoning of the Supreme Court, since we have a provision extending the term "person" to the sovereign, we can infer that the Legislature *did* desire to include the sovereign in the anti-injunction act.

In the absence of any substantive legislation concerning labor disputes involving public employees, I would hold that the Indiana anti-injunction statute does apply to strikes by public employees.

The application of this statute to strikes by public employees does not strip the state, county, or city officials from keeping the peace, suppressing riots or preventing social chaos. Neither does it mean that the court can never enjoin a strike.[5] It does mean that there are certain *necessary conditions* which must be fulfilled before the Court can determine whether or not a strike is illegal. There is no issue here of whether or not the State may act in self-defense. The statute

---

5. Roth v. Local Union No. 1460 of Retail Clerks Union (1939), 216 Ind. 363, 24 N.E. 2d 280.

itself provides for the issuance of a temporary restraining order without notice under certain circumstances.[6] The issue is what is the appropriate role for a court in the area of labor disputes. I would not have it being used as a tool in collective bargaining. I believe that until the Legislature acts further, the Court should apply the anti-injunction act in cases of strikes by public employees and not a judicial version of martial law.

Jackson, J., concurs.

NOTE.—Reported in 251 N. E. 2d 15.

### ON PETITION FOR REHEARING AND ON PETITION
### FOR LEAVE TO FILE BRIEF AMICUS CURIAE.

GIVAN, J.—Appellant's petition for rehearing in this case was filed on October 21, 1969. Thereafter, on the 20th day of November, 1969, Loran W. Robbins and James R. Nolan, who are members of and President and Secretary-Treasurer, respectively, of Teamster Local Union No. 135 in Indianapolis, filed their petition to file brief as amicus curiae. This was the first time that said petitioners or anyone similarly situated have sought to intervene as amicus curiae in this appeal. In their petition they seek to raise a new question that the judgment and order against the Anderson Federation of Teachers, Local 519, is a nullity for the reason that said Local is not a separate entity, citing the case of *Local Union No. 135, International Brotherhood of Teamsters, etc., et al. v. Merchandise Warehouse Company* (1956), 127 Ind. App. 57, 63, 64, 132 N. E. 2nd 715, 718.

---

6. "Provided, however, That if a complainant shall also allege that, unless a temporary restraining order shall be issued without notice, a substantial and irreparable injury to complainants property will be unavoidable, such as temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. Such a temporary restraining order shall be effective for no longer than five days and shall become void at the expiration of said five days." Burns' Ind. Stat. Ann. § 40-507.

Appellees have filed objections to the petition for leave to file brief amicus curiae in which they point out that the established law in Indiana is that a question or issue may not be presented to the Court for the first time on a petition for rehearing, citing *Browne v. Blood* (1964), 245 Ind. 447, 196 N. E. 2d 745, rehearing denied 199 N. E. 2d 712; *Hardin v. State* (1964), 246 Ind. 23, 201 N. E. 2d 333, rehearing denied 202 N. E. 2d 164.

It is thus argued that parties seeking to intervene as amicus curiae should not be permitted to so raise a new question for the reason that they are required to accept the case as they find it at the time of their petition to intervene. *City of Indianapolis v. Wynn* (1959), 239 Ind. 567, 157 N. E. 2d 828, rehearing denied 239 Ind. 567, 159 N. E. 2d 572; *Indiana State Board of Medical Registration v. Seulean* (1942), 219 Ind. 321, 328, 37 N. E. 2d 935.

With this we agree, and for that reason we deny the petition to file brief amicus curiae at this time. However, because the question raised casts reflection upon eminent counsel handling the appeal for the Anderson Federation of Teachers, Local 519, in that it suggests they failed to raise a pertinent point in the case, we feel compelled to point out that the case of *Local Union No. 135 v. Merchandise Warehouse Company, supra,* cited by those seeking to intervene, after recognizing the general principal which is urged by the intervenors, states as follows:

> "An examination of the whole record, however, indicates that this is a suit against a class of individuals too numerous to be brought into court and that the appellants James Burrello, William Schlott, Harry Belmore and Gene San Soucie were sued as the representatives of that class known as Teamsters Local No. 135. The judgment, by its express terms runs against all members of Teamsters Local No. 135, separately and severally, and against Gene San Soucie, President, James Burrello, William Schlott and Harry Belmore as their agents and representatives. To that extent the judgment is valid."

In the case at bar the restraining order was issued against the "Anderson Federation of Teachers Local 519, and every member thereof, and all persons agreeing, combining, and conspiring with them, their representatives, officers, associates, confederates, employees, agents, representatives and servants, and all persons whomsoever known or unknown to whom notice thereof shall come, . . . ." The judgment of contempt was rendered against the Local and fine levied in the sum of $500.00 per day starting with May 3, 1968, and for each school day ". . . said Anderson Federation of Teachers Local 519 and all of its members continue to strike, picket or in any manner interfere with plaintiff's conduct with the public schools of the City of Anderson." It is thus apparent that even by the authority of the very case cited by those seeking to intervene that the judgment rendered in this case is valid for the reason that the restraining order and the judgment include the individual members of the Union.

The fact that counsel for appellant did not raise this question themselves is certainly no reflection on their ability. It is commendable they did not raise a question which was so obviously not involved in the case.

Question is raised by the petition for rehearing that the decision of the Court is erroneous in holding that government employees may not engaged in a strike for any purpose in that there is no statute enacted by the General Assembly declaring such to be the public policy of the State of Indiana. The State of Indiana by statute has adopted "the common law of England, and the statutes of the British Parliament made in aid thereof prior to the fourth year of the reign of James the First . . . ." Burns' Ind. Stat. § 1-101.

The text which we quoted in our opinion from *U. S. v. United Mine Workers of America* (1947), 330 U. S. 258, 91 L. Ed. 884, 67 S. Ct. 677, is a statement of the common law and thus also expressly a part of the law in the State of Indiana.

As was stated in *U. S. v. Herron* (1873), 20 Wall. 251, 22 L. Ed. 275, it is a maxim of the common law that ". . . when a statute is general and any prerogative, right, title, or interest would be devested or taken from the King, in such a case he shall not be bound unless the statute is made by express words to extend to him, . . ."

And in speaking of the same proposition, the Supreme Court of the United States in the case of the *Dollar Savings Bank v. U. S.* (1873), 19 Wall. 227, 239, 22 L. Ed. 80, 82, stated:

> "The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him [the King] in the least, if they may tend to restrain or diminish any of his rights and interests."

As pointed out in our original opinion, there is no right of public employees to strike. At the time of the formation the common law state of Indiana the public strike is not in the service of the king was considered treason. Thus, in the common law state of Indiana the public strike is not lawful.

The anti-injunction statute, a "policy statute," does not apply to the state government or any of its subdivisions and by its very terms and definitions is confined to "labor disputes" in the private sector of the body politic. Any change in this status of the law which might permit any type of public strike can only be accomplished by express "public policy" legislation so stating.

We feel that other matters contained in the petition for rehearing are adequately covered by the original opinion.

Petition to intervene amicus curiae is denied.

Petition for rehearing is denied.

Hunter, C. J., and Arterburn, J., concur; DeBruler, J., dissents with opinion in which Jackson, J., concurs.

ON PETITION FOR REHEARING AND FOR LEAVE
TO FILE BRIEF AMICUS CURIAE

DISSENTING.

DEBRULER, J.—My overall view of this case continues to be that the teachers here involved, like all citizens, have a constitutionally protected right to conduct themselves in any manner that they see fit, so long as they do not act in a manner which violates a reasonable and existing law. My research of the law of Indiana reveals that at the time these teachers peacefully demonstrated the firmness of their demands concerning terms of employment to the school board and community, by stopping work and picketing, there was no law in this State which prohibited such action.

Consequently, in my opinion, the trial court erred, when it judicially determined that a violation of law had occurred. I vote in favor of granting a rehearing in this case.

Jackson, J., concurs.

NOTE—Reported in 254 N. E. 2d 329.