Rose MARTIN, Roberta Keck, Judith Gonzales, Ben Tolin, Paul McDonald, Robert Townsend, John Dahm, Maureen Dewey, Cheryl Carmichael, Lycinda Conger, Donna Koontz, Carol Erner, Sally Wilson, Barbara McGuire, Kathleen Cellar, Margaret Miller, Kenneth Hosmer, Frank Mascarenas, Ronald Maas, Daniel Fulks, Bruce Baylor, Jeanne Barlow, Deborah Keel, Paul Crawford, Robert Erner, Bill Cooper, Linda Allar, Kenneth Carmichael, Georgia Patcheck, Carole McWilliams, Anna Smith, Sharon Wilson, Nila Jo Schwindt, Marilyn Kirkwood, Robert Wilson, Ruby Jean Barber, Karel Miller, Janice Harding, Norma Anderson, Robert Keeler, Kim "Slim" McWilliams, and Shirley Russel, Petitioners,

v.

MONTEZUMA–CORTEZ SCHOOL DISTRICT RE–1, Bruce McAfee, Harold Gresh, Janice Hutchinson, Robert Green, Steve Chappel, Robert Cruzan, and F.K. Howerton, Respondents.

MONTEZUMA–CORTEZ SCHOOL DISTRICT RE–1, Petitioner/Cross–Respondent,

v.

MONTEZUMA–CORTEZ EDUCATION ASSOCIATION, San Juan Basin Uniserv, a Colorado corporation, Colorado Education Association, a Colorado corporation, Rose M. Martin, Roberta J. Keck, Judith Gonzales, Roberta Keeler, Kim "Slim" McWilliams, John Dahm, James V. Lang, and James E. Mills, Respondents/Cross–Petitioners.

Nos. 90SC562, 90SC568.

Supreme Court of Colorado, En Banc.

Oct. 26, 1992.

Rehearing Denied Dec. 1, 1992.

Larry F. Hobbs, Hornbein MacDonald Fattor and Hobbs P.C., Denver, Robert H. Chanin, John M. West, Bredhoff & Kaiser, Washington, D.C., for petitioners in No. 90SC562 and for respondents/cross-petitioners in No. 90SC568.

Kenneth A. DeLay, Fred C. Kuhlwilm, Miller & Delay, P.C., Westminster, for respondents in No. 90SC562.

Fred C. Kuhlwilm, Kenneth A. DeLay, Margaret M. Sickel, Miller & Delay, P.C., Westminster, for petitioner, cross-respondent in No. 90SC568.

Lauren B. Kingsbery, Denver, for amicus curiae Colo. Ass'n of School Boards.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' opinion in the consolidated cases of *Martin v. Montezuma–Cortez School District RE–1* and *Montezuma–Cortez School District RE–1 v. Montezuma–Cortez Education Association,* 809 P.2d 1010 (Colo.App.1990). The court of appeals held: (1) that a strike by teachers of the school district was illegal; (2) that despite the strike's unlawfulness the teachers were not liable for tortious interference with the contracts between the school district and other teachers; (3) that the school district's termination of the striking teachers' employments did not violate the teachers' due process rights; and (4) that the school district's failure to follow the procedures of the Teacher Employment, Dismiss-

al, and Tenure Act was harmless error. We reverse in part and affirm in part.

I

On January 26, 1981, Rose Martin and approximately half of the teachers employed by the Montezuma–Cortez School District RE–1 went on strike against the school district. Martin and the other teachers were members of the Montezuma–Cortez Education Association (MCEA). The teachers' stated purpose for striking was to compel the school district to recognize the MCEA as the exclusive bargaining agent for the teachers and to have the school district negotiate a master contract with the MCEA. The underlying motive for the pursuit of a master contract was to address or to improve teacher salaries, the quantum of hours of service required by the school district, and other working conditions such as class size and textbook purchases. At the time of the strike, most of the teachers were under individual contracts for the 1980–81 school year. Written contracts between teachers and school districts were required by section 22–63–107 of the Teacher Employment, Dismissal, and Tenure Act of 1967, sections 22–63–101—22–63–118, 9 C.R.S. (1973) (as amended) (Teacher Tenure Act).[1] These contracts provided that if "the Teacher fails or refuses to perform services as required in this Contract without the failure having been approved by the Board" of the school district, the school district may "elect to treat such failure as abandonment" of the employment contract.

In the months preceding the strike, the school district held several meetings and made several proposals to the teachers but consistently refused to recognize, or to negotiate with, the MCEA. The proposals made by the school district, falling short of recognition of the MCEA, were unacceptable to the teachers. The school district and the teachers of the MCEA thus came to an impasse in their dispute.

Before the strike, on January 6, 1981, counsel for the MCEA, pursuant to section

1. Now called the Teacher Employment, Compensation and Dismissal Act of 1990, and codified, without relevant change, at §§ 22–63–101—22–63–118, 9 C.R.S. (1988 & 1991 Supp.).

8–1–125(2), 3B C.R.S. (1986), notified the director of the Division of Labor (director) of the Colorado Department of Labor and Employment that a labor dispute existed between the teachers of the MCEA and the school district. Counsel for the school district countered in a letter to the director that the school district was opposed to any intervention by the director and that it would take legal action to prevent that intervention. The school district took the position that the director lacked jurisdiction to intervene in any alleged labor dispute involving the school district. The director, "[b]ased on the information provided by the parties," concluded that jurisdiction by the Division of Labor "would serve no useful purpose." By order dated January 30, 1981, *nunc pro tunc* January 23, 1981, the director declined to exercise jurisdiction in the dispute.

Soon after the first day of the strike, the school district sent Martin and the other striking teachers written directives demanding that they return to work and informing them that failure to do so might be considered an "abandonment" of their contracts. By February 24, 1981, half of the striking teachers returned to work. On March 6, 1981, the school district notified the teachers that hearings would be held by the school board in order to determine whether any of the individual striking teachers wished to return to work, and those *ad hoc* hearings commenced shortly thereafter. The striking teachers communicated to the school district their position that the hearings must conform to the requirements of the Teacher Tenure Act. The teachers also specifically denied that they had the intent to abandon their employment contracts. Only one striking teacher attended the hearings and returned to work. The other striking teachers did not attend. The school district, having determined that the teachers "voluntarily terminated" their employment and "abandoned" their contracts by striking, discharged the teachers on April 17, 1981.

To summarize the legal proceedings below, on the first day of the strike, January 26, 1981, the school district filed an action in the district court seeking to enjoin the strike and to obtain damages resulting from the strike. The trial court issued a preliminary injunction on February 2, 1981, finding the strike illegal under the common law and ordering the teachers to cease picketing and other strike-related activities. The trial court, however, did not order the teachers back to work. On June 26, 1981, the MCEA filed an action in the district court contending that the school district violated the teachers' rights under the Teacher Tenure Act and seeking damages for the unlawful dismissal.

In late 1984, the district court granted a pre-trial motion by the teachers, and ruled that the strike was legal under §§ 8–2–101 and 8–1–126, 3B C.R.S. (1986). The district court dissolved the injunction, and in January of 1985, granted partial summary judgment for the teachers on the school district's tort claims. The school district's remaining contract claims were consolidated with the teachers' action. The contract claims were voluntarily dismissed in a partial settlement, and the jury returned verdicts against the teachers on their claims for wrongful termination. On the teachers' claims, the trial court refused to give the teachers' proffered jury instruction to the effect that a "strike, by itself, is not a voluntary quitting or abandonment of employment."

The school district appealed the summary judgment on its tort claims, arguing the illegality of the strike, and the teachers appealed the judgment entered upon the jury verdicts. The court of appeals noted that "[u]nder the common law, strikes by public employees are illegal" and concluded that the trial court erred in deciding that §§ 8–2–101 and 8–1–126 "afforded [a] basis to validate the strike." *Martin*, 809 P.2d at 1013. The court of appeals, despite finding the strike illegal at common law, was nevertheless persuaded that "no tort liability for damages exists for public employee strikes." *Id.* at 1014 (citing cases from other jurisdictions). The court of appeals recognized "that imposing tort liability may be counterproductive to resolving labor disputes." *Id.* The trial court's dismissal of the school district's tort claim by summary

judgment was therefore found by the court of appeals to be proper.

As to the teachers' claims, the court of appeals found that the trial court's denial of the school district's motion to dismiss for lack of subject matter jurisdiction was also proper. *Id.* The court of appeals also ruled that the teachers' due process rights were not violated by the *ad hoc* hearings held by the school district after the strike to determine each teacher's employment status with the school district. *Id.* at 1014–15. The court of appeals also ruled that while "the teachers were entitled to a directed verdict that there had been a violation of the Tenure Act in their termination," that violation was harmless error. *Id.* at 1015. The school district petitioned this court for writ of certiorari and the teachers cross-petitioned for writ of certiorari.

## II

The threshold question presented is whether public employees in Colorado have the right to strike. Before today, the question has not been expressly presented to a Colorado appellate court.[2] We hold that, under the relevant statutes, employees in the public sector have a qualified right to strike subject to explicit executive and judicial controls. Before turning to the stat-

utes, we review in Subpart A the precursors of the current statutes in order to place our holding in proper perspective. Because the controlling statutes form a more or less comprehensive scheme for the regulation of strikes, the substantive statutory provisions are set forth at some length in Subpart B. Subpart C contains our analysis of those provisions according to well-established principles of construction. In Subpart D, we address the school district's arguments against the right of public employees to strike.

## A

The original version of the controlling statutes was known as the Industrial Relations Act and was born of the labor strife which nearly destroyed Colorado in the last decade of the nineteenth century and in the first decades of the twentieth.[3] The situation in Colorado approached "a condition of absolute prostration of government and of actual revolution."[4] Private "business [too] for long periods had lain prostrate, [and] much property had been destroyed."[5] Anarchy loomed when the state militia attacked Ludlow, "a tent colony established by striking miners employed by the Colorado Fuel & Iron Co.," on April 20, 1914. "[E]leven children and two women were killed."[6]

---

2. *See Board of Water Works v. Pueblo Water Works Employees Local 1045,* 196 Colo. 308, 312, 586 P.2d 18, 20 (1978) (noting but declining to decide the question whether public employees have a right to strike). *See also* John A. Criswell, *Collective Bargaining for Local Public Employees in Colorado,* 8 Colo.Law. 2122, 2138 (1979) (issue of whether "strikes and work stoppages are prohibited in Colorado ... has yet to be faced by a Colorado appellate court"). As to the right of private employees to strike, in *People v. United Mine Workers of America,* 70 Colo. 269, 273, 201 P. 54, 56 (1921), we held that under the Industrial Relations Act "[t]here is not even a prohibition of strike. The only thing forbidden is a strike before or during the [industrial] commission's action."

3. *See First Report of The Industrial Commission of Colorado* (1917) at 87: "History of labor troubles in Colorado, since the enactment of the [Industrial Relations Act], has provided ample justification for its existence." *See also Pass This Law,* The Rocky Mountain News, Feb. 14, 1915, § 4, at 4: "Colorado in the last twenty

years has suffered from labor troubles as few other states have suffered and the taxpayers yearly are being called upon to pay the bills. Whatever may be done to improve the [employer/employee] relationship and provide against repetition of these evils should be undertaken without delay" (editorial advocating enactment of the Industrial Relations Act).

4. Raymond L. Hogler, *The Regional Transportation District Strike and the Colorado Labor Peace Act: A Study in Public Sector Collective Bargaining,* 54 U.Colo.L.Rev. 203, 212 (1983) (citing G. West, *Report on the Colorado Strike* (1915)).

5. Thomas P. Fry, *Governmental Adjustment of Colorado's Industrial Disputes,* 3 Rocky Mtn. L.Rev. 223, 224 (1931).

6. Hogler, *supra* n. 4 at 212 n. 56. *See Voluntary vs. Forced Reforms,* The Rocky Mountain News, Mar. 2, 1915, at 6: "A strike was forced on the state that paralyzed almost every industry without the state having official authority to inter-

The intense labor strife, culminating in the violence at Ludlow, was the catalyst of the state's equally remarkable legislative response.[7] The legislature met in special session and appointed a joint legislative committee to examine labor conditions and the governmental response to labor disputes. Senate Joint Resolution No. 6, 1914 Colo.Sess.Laws, Extraordinary .Session at 17. The committee conducted an intensive investigation and reported to the General Assembly with various recommendations for legislative action. ˙ *See* Senate Journal, Twentieth General Assembly 1915, pt. 2 at 61–66. The committee particularly identified the need to empower the Governor to act promptly to prevent strikes:

> The Governor, as the chief executive, is charged with the duty of preserving the peace of the State, but the State at the present time has no machinery through which he can act at the inception of a difficulty....
>
> It has been true in general of strikes, including our recent coal strikes, that the bitterness engendered by incidents arising after the declaring of the strike, has almost overshadowed the original grievances. For this reason, settlement of differences is much easier before than after the declaring of a strike, and it is for this reason that arbitration of some nature is especially valuable.

Senate Journal at 64. Prodded by Governor Carlson,[8] the victor in the elections of 1914, the General Assembly established the state's first workers' compensation plan and a new public authority, then called the industrial commission, to supervise labor relations. With the first workers' compensation act and the original Industrial Relations Act of 1915, the General Assembly determined and defined the relations between employer and employee, provided for safe workplace conditions and compensation for accidental injury, and empowered the industrial commission to interpose its supervisory authority and to intervene in all labor disputes. Chs. 179 and 180, 1915 Colo.Sess.Laws 515, 562.

For our purposes here, the Industrial Relations Act, which created and empowered the industrial commission, is the most significant. The original Industrial Relations Act provided the qualified right to strike by all employees, both private and public. In the original act, the legislature clearly defined an "employer" to mean and include not only private employers but also:

> The state, and each county, city, town, irrigation and *school district* therein, and all public institutions and administrative boards thereof.

The term "employee" was given a correspondingly clear definition. The term included not only private employees but also:

> [E]very person in the service of the state or of any county, city, town, irrigation or *school district* therein, or of any public institution or administrative board thereof ... under any contract of hire, express or implied....

Ch. 180, sec. 4, 1915 Colo.Sess.Laws 562, 563 (emphasis added). Public employees, including the employees of school districts, thus were expressly included in the provisions of the statute.[9] When the General Assembly intended to exclude an employer or employee, the exclusion was also ex-

---

fere, altho the state, representative of the whole people, had far more at stake than the two parties to the strike.... Can it be possible that the state is to continue as it was without self-defense or the *right of participation in matters of such moment until it is too late?"*

7. *Cf. First Report of The Industrial Commission of Colorado,* 1917, at 87 (noting that "Canada has had a law since 1910 which contains provisions practically identical" with the central provisions of the Industrial Relations Act, while "the State of Massachusetts in 1909 and 1914 enacted laws which in part cover" the same ground).

8. *See, e.g.,* Governor Carlson's January 12, 1915 inaugural address, in Senate Journal 99, 99–101.

9. The original workers' compensation act provided similar definitions of "employer" and "employee." Ch. 179, sec. 4, 1915 Colo.Sess. Laws 515, 516–17. *See School Dist. No. 1 v. Industrial Comm'n,* 66 Colo. 580, 582–83, 185 P. 348, 349 (1919) (holding that in the 1915 workers' compensation act, "the term 'employer' is expressly and directly made to include school districts" and therefore holding further that school districts are not immune from the penalties and process under the act).

pressly done. Thus, for example, the Industrial Relations Act was "not intended to apply to employers of private domestic servants or farm and ranch labor." *Id.*

The Industrial Relations Act conferred upon the industrial commission the power to inquire into the rise and development of employer and employee associations, and "into the extent and results of methods of collective bargaining." Ch. 180, sec. 26, 1915 Colo.Sess.Laws 576. The commission also was granted the power

> to promote the voluntary arbitration, mediation and conciliation of disputes between employers and employees, and to avoid the necessity of resorting to strikes, lockouts, boycotts, blacklists, discriminations and legal proceedings in matters of employment.

*Id.* sec. 27, at 577. Employers and employees were required to give notice to the industrial commission before engaging in a "lockout or strike, or a suspension or discontinuation of work or employment" on account of a dispute over compensation or hours. Moreover, the Industrial Relations Act made it "unlawful for any employer to declare or cause a lockout, or for any employee to go on strike, on account of any dispute prior to or during an investigation, hearing, or arbitration of such dispute by the commission...." *Id.* secs. 29, 30, at 578. After such dispute "has been duly investigated, heard, or arbitrated," employers and employees were free to lockout or to strike, respectively. *Id.* sec. 30, at 578–79.

In 1921, the General Assembly amended the Industrial Relations Act. The definition of employer remained substantially the same, while the definition of employee was simplified to mean "every person in the service of an 'employer' as herein defined." Ch. 252, sec. 4, 1921 Colo.Sess.Laws 827, 829. The provisions concerning the rights to lockout and to strike were also amended in 1921, but without derogating from those rights. *Id.* sec. 11, at 840. In addition, the 1921 amendments provided that the commission could file a petition in the district court setting forth any violation or threatened violation of the acts by any employer or employee, whereupon the district court would issue a mandatory writ enjoining those violations or threatened violations. *Id.* sec. 13, at 841. These provisions were amended in 1941 and in subsequent years, again without derogating from the right to lockout or to strike. Ch. 165, 1941 Colo. Sess.Laws 531; Ch. 201, 1969 Colo.Sess. Laws 584; Ch. 100, 1972 Colo.Sess.Laws 576, 601–609.

B

The substance of the Industrial Relations Act and of subsequent amendments is now codified in Article 1 of Title 8, 3B C.R.S. (1986). Therefore, for purposes of continuity, we shall refer to Article 1 of Title 8 as the Industrial Relations Act. The definitions of employer and employee in the present Industrial Relations Act are virtually identical to those provided by the original act of 1915. An employee still includes "every person in the service of an employer, under any contract of hire, express or implied." § 8–1–101(6), 3B C.R.S. (1986). An employer still expressly includes the "state, and each county, city, town, irrigation, and *school district* therein, and all public institutions and administrative boards thereof having four or more employees." § 8–1–101(7)(a)(I) (emphasis added). Exclusions of certain employers and employees, such as employers of domestic servants and farm and ranch hands, are still expressly made. § 8–1–101(7)(b). The Industrial Relations Act defines the term "employment" to mean "any trade, occupation, job, position, or process of manufacture...." § 8–1–101(8). In addition, the Industrial Relations Act defines "general order" as "an order of the director applying generally throughout the state to all persons, employments, or places of employment under the jurisdiction of the division." § 8–1–101(9). The term "order" is defined as "any decision, rule, regulation, requirement, or standard promulgated by the director." § 8–1–101(11).

The director is the director of the division of labor in the department of labor and employment. The transfer of regulatory powers away from the industrial commis-

sion began in 1969 with the creation of the division of labor and provision for a director thereof.[10] With respect to the matters before us, the director's present powers and jurisdiction are functionally equivalent to the powers of the former commission. *See* Ch. 201, 1969 Colo.Sess.Laws 567; Ch. 64, 1986 Colo.Sess.Laws 463. Those powers were in 1981, and are now except where noted, as follows:

**8-1-103. Division of Labor—director — employees — qualifications—compensation—expenses.** (1) There is hereby created a division of labor in the department of labor and employment. Pursuant to section 13 of article XII of the state constitution, the executive director of the department of labor shall appoint the director of the division of labor.... The director shall be the chief administrative officer of the division with such powers, duties, and functions as prescribed by law.

**8-1-108. Orders effective, when—validity presumed.** (3) All orders of the division shall be valid and in force and prima facie reasonable and lawful until they are found otherwise in an action brought for that purpose, pursuant to the provisions of this article, or until revoked by the director.

**8-1-111. Jurisdiction over employer and employee relation.** The director is vested with the power and jurisdiction to have such supervision of every employment and place of employment in this state.... He is also vested with power and jurisdiction to administer all provisions of this article with respect to the relations between employer and employee and to do all other acts and things convenient and necessary to accomplish the purposes of this article.

**8-1-114. Employers and employees to furnish information—penalty.** (1) Upon request, every employer and employee shall furnish the division all information required by it to accomplish the purposes of this article....

**8-1-122. Inquiries—scope—report.** (1) The director shall inquire into ... existing relations between employers and employees; ... into the growth of associations of employers and wage earners and the effect of such associations upon the relations between employers and employees; into the extent and results of methods of collective bargaining; ... into methods of avoiding or adjusting labor disputes through peaceable and conciliatory mediation and negotiations....

**8-1-123. Arbitration.** The director shall do all in his power to promote the voluntary arbitration, mediation, and conciliation of disputes arising under an existing written agreement between employers and employees and to avoid the necessity of resorting to strikes, lockouts, boycotts, blacklists, discriminations, and legal proceedings in matters of employment....

**8-1-125. Disputes — jurisdiction — notice of changes in wages or hours of labor—penalty.** (1) The director has jurisdiction of every dispute between employer and employee affecting conditions of employment, or with respect to wages or hours, and such jurisdiction shall continue until after the final hearing of such dispute and the entry of the final award therein, or until said director shall enter an order disposing of or terminating such jurisdiction. The relation of the employer and employee shall continue uninterrupted by the dispute or anything arising out of the dispute until the final determination thereof by said director; and neither the employer nor any of the employees affected by any such dispute shall alter the conditions of employment with respect to wages or hours or any other condition of said employment; neither shall they, on account of such dispute, do or be concerned in doing directly or indirectly anything in the nature of a lockout or strike or suspension or discontinuance of work or employment.[11]

10. In 1986 the industrial commission was formally abolished. Ch. 64, sec. 2, § 24-1-121, 1986 Colo.Sess.Laws 463. *See also* §§ 8-1-146 and -149, 3B C.R.S. (1991 Supp.).

11. In 1990, this section was amended to provide for the exercise of the director's jurisdiction "only when the employer and the employee request such intervention or when the dispute, as

(8) The director shall proceed with reasonable diligence in hearing all disputes and shall render a final award or decision therein without unnecessary delay.

**8–1–126. Lockouts and strikes unlawful, when.** It is unlawful for any employer to declare or cause a lockout, or for any employee to go on strike, on account of any dispute prior to or during an investigation, hearing, or arbitration of such dispute by the director . . . under the provisions of this article. . . . Nothing in this article shall be held to restrain any employer from declaring a lockout, or any employee from going on strike in respect to any dispute after the same has been duly investigated, heard, or arbitrated, under the provisions of this article.

**8–1–128. Petition — writ — dissolution.** The director of the division of labor, as petitioner, may file in the district court . . . a verified petition against any employers, or employees, or both, as respondents, and setting forth any violation or threatened or attempted violation of any provisions of section 8–1–125 or 8–1–126, and, thereupon, without bond and without notice, such district court shall issue its mandatory writ enjoining the alleged violations, or attempted or threatened violations of this article, and ordering and requiring such respondents to maintain all the conditions of employment in status quo and without change until after the dispute or controversy between said employers and employees has been investigated and heard by said director and the final findings, decision, order, or award of said director made and entered therein. . . .

**8–1–129. Strikes and lockouts—penalties.** (1) Any employer declaring or causing a lockout contrary to the provisions of this article is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than one thousand dollars, or by imprisonment in the county jail for a term of not more than six months, or by both such fine and

imprisonment. Each day or part of a day that such lockout exists shall constitute a separate offense under this section.

(2) Any employee who goes on strike contrary to the provisions of this article is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than fifty dollars, or by imprisonment in the county jail for a term of not more than six months, or by both such fine and imprisonment. Each day or part of a day that the employee is on strike shall constitute a separate offense under this section.

**8–1–130. Petition for Review of order—irregularities waived.** The director has full power to hear and determine all questions within his jurisdiction, and his findings, award, and order issued thereon shall be final. . . .

3 C.R.S. (1973). The foregoing are the substantive provisions of the Industrial Relations Act which are central to the resolution of the question as to whether public employees have the right to strike.

### C

In construing a statutory scheme, a court may consider its history. *Industrial Comm'n v. Milka,* 159 Colo. 114, 119, 410 P.2d 181, 183 (1966) ("It is basic to our system of jurisprudence that in the interpretation of a statute courts may refer to the history of the act."). *See also Carlisle v. Pullman P.C. Co.,* 8 Colo. 320, 327–28, 7 P. 164 (1885) ("Chief among the considerations to be weighed in the construction of a statute are the objects to be accomplished, the evils to be remedied, and the circumstances under which it was enacted."). We have also held that a "legislative intent to change the meaning of statutes in the course of a general revision will not be inferred unless this intent is clearly and indubitably manifested." *Davis v. Conour,* 178 Colo. 376, 382, 497 P.2d 1015, 1018 (1972).

"In interpreting a comprehensive legislative scheme, we must give meaning to all

determined by the executive director, affects the public interest. . . ." Ch. 59, sec. 1, 1990 Colo.

Sess.Laws 461.

portions thereof and construe the statutory provisions to further legislative intent." *A.B. Hirschfeld Press v. Denver*, 806 P.2d 917, 920 (Colo.1991). In construing a statute or statutes, "we seek to determine the intent of the legislature as expressed in the language it selected." *Triad Painting Co. v. Blair*, 812 P.2d 638, 644 (Colo.1991). That is, "a court should look first to the plain language of the statute," and the words used "should be given effect according to their plain and ordinary meaning." *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991). "If the language of a statute is clear and unambiguous there is no need to resort to interpretive rules of statutory construction." *Bloomer v. Board of County Comm'rs*, 799 P.2d 942, 944 (Colo.1990). Strained or forced constructions of statutes are disfavored. *Triad Painting*, 812 P.2d at 644.

Finally, "[t]hat the legislature has the power to define terms used by it and that statutory definitions control judicial interpretation cannot be doubted." *Industrial Comm'n v. Northwestern Mut. Life Ins. Co.*, 103 Colo. 550, 556, 88 P.2d 560, 563 (1939). "The Legislature has a right" to "define various words, including employer and employee." *Industrial Comm'n v. Continental Inv. Co.*, 78 Colo. 399, 403, 242 P. 49, 50 (1925). Only in the absence of express definitions will statutory terms be construed according to the various interpretive rules governing the construction of statutes. *Moody v. Larsen*, 802 P.2d 1169, 1171 (Colo.App.1990). Moreover, "[a]n exception not made by the Legislature cannot be read into the statute." *Karoly v. Industrial Comm'n*, 65 Colo. 239, 245, 176 P.

284, 286 (1918). Absent constitutional infirmity, it is not within the judicial power to exclude from a statute that which the legislature expressly includes.

Our review of materials documenting the enactment of the original Industrial Relations Act discloses little separate discussion of the legislative decision to include public employers and employees within the scope of the Act.[12] Understandably, most of the attention was focused on the private sector, particularly on the mining industry. The early history of the implementation of the Industrial Relations Act is more helpful, revealing that the Act applied to public employers and employees from its inception. According to the reports issued by the first industrial commissions soon after the passage of the Industrial Relations Act, public employers and employees were subjected to the initial jurisdiction of the commission in order to defuse potential labor disputes.[13] Thus, that the Industrial Relations Act was intended as a regulatory scheme comprehending both private and public employers and employees is corroborated by the early administrative practice under the Act.[14]

Besides what we can gather from the early history and administration of the Industrial Relations Act, the language of the Act speaks for itself. By its definitions, the Industrial Relations Act grants the right to strike to all employees, private and public, and concurrently places conditions on the exercise of that right. Thus, public employees must accept the possible intervention of state authorities in labor disputes with their public employers whenever

**12.** Contemporary reports, however, routinely stated that the Act applied to both public and private employees. *See, e.g., Industrial Bill Draft Finished*, The Rocky Mountain News, Dec. 20, 1915, § 2, at 1 ("The bill gives to the commission full authority over sanitation and safety in all places, public and private, where men or women are employed....").

**13.** *See Fifth Report of the Industrial Commission of Colorado*, 1921, at 135: "Case No. 702. City of Fort Morgan vs. Employees. Fort Morgan. September 9, 1921. Notice of reduction in wages. No protest by employees."; and *Sixth Report of the Industrial Commission of Colorado*, 1922, at 159: "Case No. 864. Town of Peetz

vs. Employees. Peetz. January 31, 1922. Notice of wage reduction." In that case, the commission declined jurisdiction because the town had only one employee and the Act did not apply to "employers who employ less than four employees." Ch. 180, Sec. 4, 1915 Colo.Sess. Laws 562, 563.

**14.** The contemporaneous interpretation given to a statute by the administrative agency charged with its enforcement is entitled to deference. *See Board of Assessment Appeals v. Country Club*, 792 P.2d 299, 301 (Colo.1990); *Colorado Common Cause v. Meyer*, 758 P.2d 153, 159 (Colo.1988).

the paramount interests of the Colorado community as a whole require that intervention. By the express inclusion of employees of the state, its political subdivisions and the school districts thereof, the legislature concluded that public employees face many of the same problems in pursuit of their livelihoods as do their counterparts in the private sector.[15] The legislature further found that the same regulatory measures should be applied to both public and private employers and employees.

By choosing to treat public and private labor relations in the same manner, Colorado clearly departed from the general practice in other jurisdictions of dealing with the two spheres of labor relations differently.[16] We are aware that the federal government and many states by statute have prohibited strikes by public employees.[17] Colorado has declined to take that step.[18] The legislature when it has spoken, in 1915 and subsequently, has regulated strikes by public employees. Furthermore, this court, when faced with legislative si-

lence, has found an inherent right of public employees to engage in collective bargaining. *Littleton Educ. Ass'n v. Arapahoe County Sch. Dist.*, 191 Colo. 411, 553 P.2d 793 (1976). We note that teachers' associations are not uncommon in Colorado, and that they have engaged in collective bargaining and have negotiated agreements with their respective school districts.[19] Indeed, teacher strikes have occurred in the past and such strikes sometimes have been enjoined. *Id.* at 413–14, 553 P.2d at 795; *Rockey v. School District # 11, El Paso County*, 32 Colo.App. 203, 508 P.2d 796 (1973).[20]

▓▓▓ Reading the Industrial Relations Act with the express definitions of employer and employee in mind, we conclude that public employees have a qualified or conditional right to strike, as do private employees. Disputes in the public sector, particularly those leading to strikes, are subject to the authority of the director of the division of labor. The statutory conditions placed

15. *See School Dist. No. 1 v. Industrial Comm'n*, 66 Colo. 580, 584, 185 P. 348, 350 (1919) (construing the original 1915 workers' compensation act, and concluding that there is "'no reason why the public, acting by its lawmaking powers, may not provide that its employees shall have as part of their compensation certain indemnities in case of accidental injury in the public service'"), *quoting Borgnis v. The Falk Co.*, 147 Wis. 327, 133 N.W. 209 (1911).

16. With the passage of the Labor Peace Act in 1943, now codified at §§ 8–3–101—8–3–123, 3B C.R.S. (1988), private sector labor relations did receive exclusive attention, but without affecting the general right to strike. *See* section 8–3–103, 3B C.R.S. (1986) (Labor Peace Act should not be construed "so as to interfere with or impede or diminish in any way the right to strike").

17. *See, e.g., County Sanitation Dist. v. L.A. County Employees Ass'n*, 699 P.2d 835, 838 n. 7 (Cal. 1985) (noting the original prohibition of strikes by federal employees in the Taft–Hartley Act of 1947); Donald A. Dripps, *New Directions for the Regulation of Public Employee Strikes*, 60 N.Y.U.L.Rev. 590 n. 1 (1985) (cataloging the statutory prohibitions in other states). However, Colorado is not alone in treating the public and private sectors similarly. Strikes by public employees are allowed in eleven other states. *County Sanitation Dist.*, 699 P.2d at 838 n. 8.

18. We note several failed efforts to make certain strikes illegal in Colorado. *See, e.g., American*

*Fed'n of Labor v. Reilly*, 113 Colo. 90, 101, 155 P.2d 145, 150 (1945) (holding unconstitutional sections of the Labor Peace Act which, *inter alia*, would have required a secret ballot to authorize a "lawful" strike); *In re Second Initiated Const. Amend. Respecting Rights of the Public to Uninterrupted Services by Public Employees*, 200 Colo. 141, 150, 613 P.2d 867, 873 (1980) (concerning proposed constitutional amendment, which did not qualify for the ballot, providing that: "Public employees in this state are prohibited from engaging in any work stoppage, slowdown, or strike, or from engaging in any interruption of services.").

19. According to the Colorado Association of School Boards, amicus here, one third of the school districts in Colorado have entered into master contracts with their teachers.

20. Recently, the Industrial Relations Act was invoked by the Governor in response to a labor dispute between the Denver Public Schools and the Denver Classroom Teachers Association. The executive director of the Department of Labor and Employment, pursuant to §§ 8–1–101—8–1–151, found that the dispute affected the public interest, held hearings on the contract dispute, which involved salaries and other working conditions, made further investigations, and issued an order settling the dispute. Order by Governor Roy Romer and Executive Director John J. Donlon, March 27, 1991.

on the right to strike attest to the legislature's judgment in 1915 that an absolute right to strike, by either private or public employees, may be as contrary to the public interest as is an absolute ban on the right to strike.

■ The Industrial Relations Act unequivocally vests the director with jurisdiction over "every employment." § 8–1–111. Teaching in a public school is certainly an "occupation" or "position" within the meaning of the Industrial Relations Act. § 8–1–101(8). As school districts are expressly included in the definition of employer, the director has the power to supervise the employment relationship between school districts and their teachers. The director may inquire into the existing relations between them, may collect any information regarding such relationship, and may develop policies aimed at avoiding or adjusting disputes arising within that relationship in order to further the purposes of the Industrial Relations Act. § 8–1–122.

Undoubtedly the chief purpose of the exercise of the director's jurisdiction under the Industrial Relations Act is to "avoid the necessity of resorting to strikes, lockouts, boycotts, blacklists, discriminations, and legal proceedings in matters of employment." § 8–1–123. The matters of employment which can lead to such strikes and lockouts include not only "disputes arising under an existing written agreement" between public employers and their employees, id., but also disputes over the lack of an agreement as indicated by sections 8–1–122 and 8–1–126. Disputes over written contracts, or the lack thereof, are common between school districts, as employers, and teachers, as employees. Such disputes certainly may lead to legal proceedings which the director may seek to avoid by voluntary arbitration [21] and media-

tion or conciliation. § 8–1–123. Experience, as reflected in this case and in our prior decisions, shows that negotiations between school districts and their teachers over salaries and services may reach an impasse as easily as negotiations in the private sector. At the point of impasse, a strike may appear to the teachers as the only remaining alternative. Section 8–1–126 provides for this eventuality, forbidding a strike while the director maintains jurisdiction but permitting a strike after that jurisdiction terminates should the employees deem a strike to be in their best interests.

■ Thus, the Industrial Relations Act guarantees that there is no absolute right to strike by public employees in Colorado.[22] For so long as the director has jurisdiction of a labor dispute, several tiers of substantive and procedural conditions on the right to strike preclude the dangers otherwise inherent to an absolute right to strike. These conditions [23] determine when public employees may exercise their right to strike. The Industrial Relations Act provides that once the director takes jurisdiction of a labor dispute, the status quo shall be maintained. § 8–1–125.

■ Once jurisdiction is taken, the director must promote the voluntary arbitration, mediation, or conciliation of the dispute. *Id.* See also *Industrial Comm'n v. People ex rel. Metz*, 86 Colo. 377, 386–87, 281 P. 742, 745 (1929). The director has the power to gather information from the parties. This alone may serve to cool tempers and to open the way to conciliation. Here, the parties reached an impasse and the director declined to take jurisdiction on January 30, 1981, *nunc pro tunc* January 23, 1981. When the director terminated jurisdiction, the teachers were free to exer-

21. *Cf. Regional Transp. Dist. v. Colorado Dep't of Labor and Employment*, 830 P.2d 942 (Colo. 1992).

22. Indeed, as already noted, *supra* n. 2, neither do private employees have an absolute right to strike. *United Mine Workers*, 70 Colo. 269, 201 P. 54 (1921).

23. In addition, other conditions may be contained in other statutes, such as the Teacher Tenure Act, the School District Budget Law of 1964, §§ 22–44–101—22–44–117, 9 C.R.S. (1988 & 1991 Supp.), and the Public School Finance Act of 1988, §§ 22–53–101—22–53–208, 9 C.R.S. (1988 & 1991 Supp.). Presumably, all relevant statutory conditions will be considered by the director in the exercise of jurisdiction over a public sector labor dispute.

cise their right to strike or not according to their view of their best interests.[24] Section 8–1–126 provides that nothing in the Industrial Relations Act shall be construed to restrain any employee from striking in any dispute over which the director's jurisdiction is concluded. If the director had retained jurisdiction, the Industrial Relations Act provides in its most important provision that the director may render a final order settling the dispute in the event that voluntary mediation or conciliation fails. §§ 8–1–103, –111, –125, and –130. *See also* § 8–1–121 (providing for contempt proceedings for failure to comply with an order of the director or for refusal to testify in a matter over which the director has exercised jurisdiction).

Finally, the exercise of jurisdiction by the director, or the decision not to exercise jurisdiction, is itself subject to the restraints of the electoral process. The director is subject to the oversight of the executive director of the Department of Labor and Employment. § 8–1–103(3). The executive director is in turn politically accountable, serving at the pleasure of the governor. § 24–1–121(1), 10A C.R.S. (1988). *See Regional Transportation District v. Colorado Department of Labor and Employment,* 830 P.2d 942 (Colo. 1992). Should the director's exercise or non-exercise of jurisdiction over a particular labor dispute displease the people, their voice may be heard at the next election.[25]

D

Because the definitions of the Industrial Relations Act plainly encompass both private and public labor relations, and because public sector labor disputes are clearly subject to the jurisdiction of the director, we reject the school district's argument that the General Assembly "has chosen not to regulate public sector labor disputes." The school district also argues, however, that despite the express definitions of employer and employee in the Industrial Relations Act, we nonetheless should disregard those definitions when reading section 8–1–123 because school districts cannot lockout their teachers. The school district's contention is that because school districts cannot lockout their teachers, application of the principle of reciprocity means that teachers cannot strike.[26] Assuming, *arguendo,* that public employers cannot lockout their employees,[27] we note that the Industrial Relations Act is silent as to whether public employers can replace striking employees. Replacement is an "economic weapon" vastly more potent than the lockout. *See* Part IV of this opinion.

Furthermore, if we were to adopt the school district's reading of section 8–1–123, we would have to ignore the express definitions of employer and employee when reading sections 8–1–125, 8–1–126 and 8–1–129 of the Industrial Relations Act as well. We decline to do so. *Industrial Comm'n v. Lindvay,* 94 Colo. 531, 533, 31 P.2d 495, 496 (1934) ("Under our Constitution, courts possess no power to nullify by judicial repeal what has been regularly enacted by the legislative branch of the government."). In the face of the express definitions of employer and employee in the Industrial Relations Act, the school district argues

---

**24.** Section 8–1–125(2) then required employees to give thirty days' notice to the director of an intended strike, and only twenty days elapsed between the teachers' notice to the director and the strike. Under section 8–1–125(1), the employment relationship "shall continue uninterrupted by the dispute or anything arising out of the dispute until the final determination thereof" by the director. Since the director assumed and then terminated jurisdiction within the notice period, the teachers were not required to wait the full thirty days before striking.

**25.** *Cf.* Hogler, *supra* n. 4, discussing the strike against the Regional Transportation District by the Amalgamated Transit Union in 1982 and

commenting on the negative publicity surrounding the director's handling of the strike.

**26.** *See* Donald A. Dripps, *New Directions for the Regulation of Public Employee Strikes,* 60 N.Y.U.L.Rev. 590, 592 n. 8 (1985) ("Strikes and lockouts provide the correlative 'economic weapons' of labor and management.").

**27.** *But see* Bernard D. Meltzer and Cass R. Sunstein, *Public Employee Strikes, Executive Discretion, and the Air Traffic Controllers,* 50 U.Chi. L.Rev. 731, 740 (1983) ("public employees might be restrained by the prospect of lost wages by virtue of strikes, lockouts, or contracting out").

that public employers and employees were included in the definitional sections only so that other provisions of the Industrial Relations Act (concerning, *e.g.*, the supervision of fire escapes and the collection of statistical data under section 8–1–107) would apply and that therefore the strike provisions of the Industrial Relations Act should not apply to public employees. We reject the school district's selective application of the definitions. The argument has no support in the text of the Industrial Relations Act or its history. The General Assembly has demonstrated its own ability to be selective by expressly excluding from the provisions of the Industrial Relations Act certain employers. § 8–1–101(7)(b) (excluding employers of domestic servants or of farm labor). In view of such specific legislative selection, we cannot exclude public employers from the substantive provisions of the Industrial Relations Act, especially when those public employers are expressly included.

The school district's further argument that the right to strike by public employees is tantamount to "trial by combat" is predicated on the school district's isolation of the right to strike by public employees from the regulatory framework of the Industrial Relations Act. An absolute right to strike by public employees, exempt from any supervision by a public authority charged with the protection of the public interest, certainly would raise grave concerns. However, as demonstrated, no such absolute right to strike is granted by the Industrial Relations Act. The right is qualified and may be exercised only in conformance with the controls established by the Industrial Relations Act.

Arguments invoking concepts of sovereignty and the control of the public purse also are advanced by the school district against the right of public employees to strike. These arguments are predicated on the classical distinction between the private and public sectors. Because the plain definitions in the Industrial Relations Act include public employers and their employ-

ees, such arguments are better directed to the General Assembly. We nonetheless consider the school district's arguments in order to show that Colorado's legislative response regulating private and public labor disputes alike, although perhaps unique in its inception, is sound in theory and enjoys considerable contemporary support.

The argument against Colorado's approach is based on the theory that economic power is at the core of private sector labor relations but political power is at the core of public sector relations. While relative economic power can be reallocated or adjusted in a private sector dispute, political power, at least sovereign political power, cannot be similarly reallocated in a public sector dispute. According to this theory,

> public sector strikes are intolerable because of their political, rather than their economic impact. . . . First, there are few market restraints controlling public sector strikes because the services of striking employees are essential. Second, the scarcity of these services will foster intense public pressure on civil officials to resolve a strike. Third, no other group in the relevant political environment possesses such an effective hand. Therefore, . . . the cost of public sector strikes is unacceptably high since these strikes distort the normal functioning of the political process in public decision-making.[28]

A more empirical approach effectively rebuts the dichotomy between public and private employees. There are

> effective market restraints on public employees, such as the loss of wages, the threat of replacement, and public concern over possible tax increases. Moreover, . . . it is clear that not all governmental services are "essential". . . . In addition, forcing labor unions to rely on such traditional political strategies as lobbying can itself distort the political process by

---

**28.** Hogler, *supra* n. 3, at 220 (referring to Harry H. Wellington and Ralph K. Winter, *The Limits of Collective Bargaining in Public Employment,* 78 Yale L.J. 1107 (1969)). *See also* Note, *Proposed Public Sector Bargaining Legislation for Colorado,* 51 U.Colo.L.Rev. 107 (1979).

leading to corruption and patronage.[29] Because private and public employers and employees were not treated differently in the Industrial Relations Act, we conclude that the legislature found the similarities between private and public employment were more important than the differences.[30]

■ Certainly the human needs of public employees are identical to the needs of private employees. In prior cases we have noted that the disruption of private sector services may be as, if not more, adverse to the public interest than disruptions in public services. *United Mine Workers*, 70 Colo. at 272, 201 P. 54 ("We must take judicial notice ... that the coal industry is vitally related not only to all other industries but to the health and even the life of the people. Food, shelter and heat, before all others, are the great necessities of life and, in modern life, heat means coal."). Furthermore, the grant of the right to strike to public employees in the Industrial Relations Act does not constitute a transfer of sovereign power. By the enactment of the Industrial Relations Act, "[t]he sovereign in Colorado—the people thereof—has surrendered nothing, bargained nothing away, or in any sense abdicated." *City and County of Denver v. Mountain States Tel. & Tel. Co.*, 67 Colo. 225, 229, 184 P. 604, 606 (1919). Rather, the Industrial Relations Act recognizes the right of both private and public employees to strike. That legislatively-created right is qualified and subject to executive and judicial branch supervision in order to secure labor peace and thereby to promote the public interest.

### III

■ Because the Industrial Relations Act grants to public employees a qualified right to strike, we need not decide today whether under the common law of Colorado such strikes were prohibited. We thus affirm, albeit on the ground that the strike here was legal, the court of appeals' affirmance of the trial court's summary judgment in favor of the teachers on the school district's claim of tortious interference. The school district predicates its tort claim on the illegality of the strike and does not dispute that the strike by the teachers was otherwise peaceful. Therefore, whether, when, or to what extent any of the striking teachers are, or may be, liable in tort for any non-strike conduct are matters not before us.

■ The principle of statutory construction, urged by the school district, that statutes in derogation of the common law must be narrowly construed is a principle applicable only when an ambiguity in the language of the statute in question permits such narrowing construction and when the intent of the legislature is not to the contrary. That principle cannot be invoked to defeat the plain and manifest language of the Industrial Relations Act. Needless to say, we cannot read out of existence an express definition under the guise of narrow construction. In addition, the more extensive the scope of a regulatory scheme, the less concern we need have for the consequent displacement of the common law, assuming the common law is implicated at all. From the enactment of the Labor Peace Act in 1943, with its more detailed provisions for the regulation of private sector labor relations, the school district would have us infer an intent by the General Assembly thereby to leave the resolution of public sector disputes to the common law alone. Repeals by implication are not favored. *Uberoi v. University of Colo.*, 686 P.2d 785, 788 (Colo.1984). The two acts do

**29.** Hogler, *supra* n. 3 at 220 (referring to John F. Burton and Charles Krider, *The Role and Consequences of Strikes by Public Employees*, 79 Yale L.J. 418 (1970)). *See generally County Sanitation Dist. v. L.A. County Employees Ass'n*, 38 Cal.3d 564, 214 Cal.Rptr. 424, 699 P.2d 835 (1985) (reviewing and answering the standard objections to public sector strikes.)

**30.** *See Anderson Fed'n of Teachers v. School City of Anderson*, 252 Ind. 558, 251 N.E.2d 15, 21

(1969) (DeBruler, C.J., dissenting) ("There is no difference in impact on the community between a strike by employees of a public utility and employees of a private utility; nor between employees of a municipal bus company and a privately owned bus company; nor between public school teachers and parochial school teachers".).

not conflict, and we decline to infer from the passage of another act regulating collective bargaining in the private sector that the legislature intended to repeal the express provisions of the Industrial Relations Act and to return public sector labor relations to adjudication by the common law. When the General Assembly enacted the Labor Peace Act, it was aware of the existence and the scope of the Industrial Relations Act and could have amended that act if it had so chosen. *See City and County of Denver v. Rinker,* 148 Colo. 441, 446, 366 P.2d 548, 550 (Colo.1961) (presuming legislative awareness of other statutes).

The school district also argues that the express exclusion of public employers [31] from the Labor Peace Act, which among other things delineates the rights of private employees to organize and bargain collectively, indicates an intent by the General Assembly to deny those rights to public employees. Without those rights, the school district reasons, the teachers cannot be deemed to have the right to strike. We reject this argument, too. On the one hand, in *Littleton Education Association,* we made it clear that collective bargaining agreements in the public sector do not require express statutory authorization. 191 Colo. at 414–15, 553 P.2d at 796. On the other hand, under the Industrial Relations Act, the director has the power to inquire into "the effect of ... associations upon the relations between employers and employees; [and] into the extent and results of methods of collective bargaining." § 8–1–122.

Again, we presume that the General Assembly was aware of the scope of the Industrial Relations Act. Had the General Assembly intended in 1943 or since to return public sector labor relations to the realm of the common law, it would have specifically amended the definitions of employer and employee in the Industrial Relations Act. Furthermore, the school district ignores section 8–3–103 of the Labor Peace Act, which provides that "[e]xcept as specifically provided in [the Labor Peace Act],

nothing in [the Labor Peace Act] shall be construed so as to interfere with or diminish in any way the right to strike." The school district views the Labor Peace Act as "the heart of the Colorado statutory scheme governing labor disputes." A more accurate metaphor would consider the Industrial Relations Act as the statutory foundation governing all labor disputes and the Labor Peace Act as an addition to the law further developing the law as to private sector labor relations.

Finally, because the Industrial Relations Act provides the regulatory framework for the resolution of public sector labor disputes, we need not search the common law for remedies to resolve those disputes or claims arising from those disputes, a course also urged by the school district. The Industrial Relations Act provides ample statutory remedies. Under section 8–1–128, the director has the power of the district court at his disposal, which court may enjoin any verified violation of the Industrial Relations Act by employers and employees alike. Affected employers and employees may petition the court to dissolve the injunction upon a showing of full compliance with the provisions of the Industrial Relations Act and the director's orders, and a hearing shall be held for this purpose. In addition, section 8–1–129 provides for criminal penalties should public employees, including teachers, be found in violation of the Industrial Relations Act by striking or by continuing a strike contrary to the director's jurisdiction and/or an injunction. Sections 8–1–140 and –141 provide that, should an employer or employee violate the Industrial Relations Act in a manner for which no penalty has been specifically provided, such employer or employee commits a misdemeanor and may be punished by both fine and/or imprisonment. Such fines can be collected in a civil action brought in the name of the director. § 8–1–142. The Industrial Relations Act clearly provides an extensive array of statutory remedies.

---

**31.** Except where the state or any political subdivision acquires or operates a mass transit system or other railroad carrier. § 8–3–104(12), 3B C.R.S. (1986).

## IV

### A

Given that the strike by the teachers was lawful, the question now is whether a lawful strike constitutes an "abandonment" by the teachers of their employment contracts within the meaning of the Teacher Tenure Act. We hold that it does not. As a matter of law, a lawful strike does not constitute abandonment of employment.[32] In general, the purpose of a strike is to extract a concession from an employer and, if successful, to realize the benefit of the concession by resuming the employment. A striking employee does not intend to terminate the employment relationship. Indeed, a strike can be viewed as an expression of intent that the employment relationship continue although under different conditions. See Sandoval v. Industrial Commission, 110 Colo. 108, 120, 130 P.2d 930, 935–36 (1942) (ingredients of a strike include "a refusal to work, with intent to bring about compliance with a demand," and "an intention to return to work when compliance is accomplished"). It is unlikely that an employee intending to abandon a contract of employment would manifest that intent by striking rather than by simply leaving the job site and not returning. Here, not only did the teachers intend to return to the classroom, they also communicated that intent to the school district. By striking, the teachers did not abandon their employment contracts with the school district. Cf. NLRB v. Mackay Radio & Tel., 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938) (a "strike in connection with a current labor dispute ... is not to be construed as a renunciation of the employment relation").

32. Whether other, non-strike conduct constitutes abandonment, of course, may be a question of fact for the jury.

33. Whether a continued strike may at some point constitute a "neglect of duty" or has otherwise become a "good and just cause" for dismissal under section 22–63–116 of the Teacher Tenure Act is not before us, and we express no opinion on the matter.

### B

Because we hold that the teachers did not abandon their contracts by striking, we conclude that if the school district desired to terminate those contracts it should have followed the procedures for the involuntary dismissal of the teachers provided in the Teacher Tenure Act. See Frey v. Adams County Sch. Dist. No. 14, 804 P.2d 851, 855 (Colo.1991) ("the procedure prescribed in section 22–63–117 [must] be followed before a tenure teacher can be dismissed for loss of certification"). A legal determination that a strike per se does not constitute abandonment of employment does not mean that a teacher can never be dismissed for what may be the ultimate repercussions of striking.[33] However, the school district cannot relieve itself of the procedural requirements of the Teacher Tenure Act by unilaterally concluding that the outcome under the Teacher Tenure Act would be the same, namely, dismissal of the teachers. We decline to endorse that erroneous assumption. If a lawful strike precipitates dismissal proceedings, the hearings held and the findings made by the administrative law judge (ALJ) certainly may result in recommendations by the ALJ which differ from the school district's otherwise peremptory dismissals.[34] Although the school district need not follow the ALJ's recommendations, the school district is required to give reasons for its departure from those recommendations. § 23–63–117(10). Further, while dismissal proceedings are underway other events may intervene. For example, a teacher may decide to return to the classroom or an election might occur changing the composition of the school board. Dismissal proceedings under the Teacher Tenure Act may prompt the director to assume jurisdiction over the

34. Section 22–63–117 provides that a teacher faced with charges under the Act may request a hearing, open to the public, before an administrative law judge, who may receive evidence and subpoena witnesses. The teacher shall receive compensation during the pendency of the proceedings, has the right to counsel, the right to be heard and to present witnesses and other evidence. A record shall be made of all the evidence by the ALJ. The ALJ may recommend that the teacher be dismissed or retained.

dispute. Indeed, the director may decide to intervene and to order a settlement in the face of proposed dismissals under the Teacher Tenure Act.[35]

## C

The school district also argues that this court lacks subject matter jurisdiction of the teachers' Teacher Tenure Act claims because the claims were not filed in the district court within the 30 days required under C.R.C.P. 106. The court of appeals held that the school district's motion to dismiss on jurisdictional grounds was properly denied by the trial court. *Martin*, 809 P.2d at 1014. The school district, relying on *Frey*, argues here that the teachers' claims were based solely on the allegation that the school district abused its discretion or exceeded its jurisdiction by holding the *ad hoc* hearings and that therefore the teachers' only available remedy was under Rule 106. In *Frey*, we held that a teacher could not seek review in the court of appeals absent proceedings under the Teacher Tenure Act and noted that an "aggrieved tenure teacher may bring an action in district court under C.R.C.P. 106 to obtain relief for discharge under circumstances not in compliance" with the Teacher Tenure Act. 804 P.2d at 857. We did not hold that a Rule 106 action was the *only* avenue of relief under all circumstances.

The school district's jurisdictional argument ignores the contractual nature of the teachers' claims. The standard contract which the school district alleges the teachers abandoned by striking is required by the Teacher Tenure Act. Terms of the contract are direct reflections of provisions of the Tenure Act. The dismissal procedures of the Act form part of the contract. *See Julesburg Sch. Dist. No. RE–1 v. Ebke*, 193 Colo. 40, 42, 562 P.2d 419, 421 (1977) ("Teacher Tenure Act creates a contract by law between the school board and

its teachers"). In effect, the teachers alleged a breach of the employment contract by the school district because of the school district's failure to follow the procedures set forth in the Teacher Tenure Act. Thus, a breach of contract action in the district court is an available remedy. *Julesburg*, 193 Colo. at 43, 562 P.2d at 421. As it was the school district which intended to dismiss the teachers, and not the teachers who intended to abandon their contracts by striking, we hold that the teachers were entitled to a directed verdict on their claims that the school district violated the Teacher Tenure Act by holding the *ad hoc* hearings at which the teachers were terminated summarily.

## V

We hold that under the controlling statutes the teachers of the school district have a qualified right to strike. Because the strike here was lawful, the teachers cannot be liable in tort for peacefully striking. We also hold that a strike *per se* does not constitute abandonment of the employment relationship. Thus, the school district's failure to comply with the dismissal procedures of the Teacher Tenure Act was not harmless error. We remand the case to the court of appeals with directions to return it to the district court for further proceedings consistent with this opinion.

ROVIRA, C.J., dissents, and LOHR, J., joins the dissent.

ERICKSON, J., dissents, and LOHR, J., joins the dissent.

Chief Justice ROVIRA dissenting:

The majority holds that the General Assembly in 1915 abolished the common law rule prohibiting public employee strikes by adoption of the Industrial Relations Act of 1915 (the Act).[1] Because I am not convinced that the General Assembly abolished the common law prohibition on public employee strikes in 1915 nor that wise judi-

---

35. As noted, *supra* n. 11, the executive director may assume jurisdiction over a dispute which affects the public interest even when the parties to the dispute have not requested intervention. § 8–1–125, 3B C.R.S. (1991 Supp.).

1. Ch. 180, 1915 Colo.Sess.Laws 562. The Act is now codified as Title 8, Article 1, 3B C.R.S. (1986).

cial discretion and constraint advise abolition of this rule by judicial action, I dissent.

The majority finds that public employees enjoy a qualified right to strike on the basis of language found in the Act; the provision therein setting forth the authority and jurisdiction vested in the director of the division of labor; and limitations on the right to strike provided in the Act. I do not deny the fact that the terms "employer" and "employee" as used in the Act encompass public school teachers and indeed, all nonelective public officials.[2] Nor do I deny that the Act seeks to regulate the manner in which these employees may strike. I am not convinced, however, that these facts taken together lead inevitably to the conclusion that the General Assembly intended to create the right to strike in public sector employees.

The school teachers argue that the General Assembly abolished the common law rule in Colorado with the passage of Title 8, articles 1 and 2.[3] In the alternative the teachers argue that if the General Assembly did not abolish the common law rule in 1915, then this court should do so because the rationales commonly offered in support of the rule have been rendered obsolete.

The majority finds, in short, that given the definitions of employee and employer found in the Act and the substantive provisions of that title regulating the ability and manner in which those employees may strike, that the General Assembly intended to create the right to strike in public employees. The central provisions of the Act that the majority relies on for its holding[4] provide that:

The director shall do all in his power to promote the voluntary arbitration, mediation, and conciliation of disputes arising under an existing written agreement between employers and employees and to avoid the necessity of resorting to strikes, lockouts, boycotts, blacklists, discriminations, and legal proceedings in matters of employment....

§ 8–1–123, 3B C.R.S. (1986).

The director has jurisdiction of every dispute between employer and employee affecting conditions of employment, or with respect to wages or hours.... The relation of the employer and employee shall continue uninterrupted by the dispute or anything arising out of the dispute until the final determination thereof by said director; and neither the employer nor any of the employees affected by any such dispute shall alter the conditions of employment with respect to wages or hours or any other condition of said employment; neither shall they, on account of such dispute, do or be concerned in doing directly or indirectly anything in the nature of a lockout or strike or suspension or discontinuance of work or employment.

§ 8–1–125, 3B C.R.S. (1986).

It is unlawful for any employer to declare or cause a lockout, or for any employee to go on strike, on account of any dispute prior to or during an investigation, hearing, or arbitration of such dispute by the director ... under the provisions of this article.... Nothing in this article shall be held to restrain any employer from declaring a lockout, or any employee from going on strike in respect to any dispute after the same has been

**2.** The statute, as written in 1915, defined "employees" as "[e]very person in the service of the state or of any county, city, town, irrigation or school district therein, or of any public institution or administrative board thereof ... under any contract of hire, express or implied...." Ch. 180, sec. 4, 1915 Colo.Sess.Laws 562, 563. The statute defined an "employer" as "[t]he state, and each county, city, town, irrigation and school district therein, and all public institutions and administrative boards thereof." Id.

**3.** §§ 8–1–101 to 8–2–113, 3B C.R.S. (1986). The teachers argue that both article 2 of Title 8,

passed in 1889, and article 1 of that title created the right in public employees to strike. The majority does not rely on the provisions of article 2 in rendering its decision. I would similarly reject the teachers' contention that article 2 created the right to strike in public sector employees, in part, on the same basis that I find article 1 not to have created such a right. See infra pp. 260–261 (established common law principles should not be found to implicitly be abolished by statute).

**4.** For the full range of provisions set out by the majority, see maj. op. at 243–245.

duly investigated, heard, or arbitrated, under the provisions of this article.

§ 8–1–126, 3B C.R.S. (1986).

After consideration of these and other provisions of the Act, as well as some of the history of Colorado labor relations, the majority concludes that "the language of the act speaks for itself. By its definitions, the Industrial Relations Act grants the right to strike to all employees, private and public, and concurrently places conditions on the exercise of that right." Maj. op. at 246, 247.

### A

The majority's conclusion that the Act places conditions on the right to strike is undoubtedly correct. So too is the conclusion that the definitions found in the Act encompass public school teachers. I, however, do not think that these two findings taken together lead to the conclusion that the "act speaks for itself"—clearly answering the question of whether or not public employees have a right to strike. Indeed, I would find not only that the Act does not answer this question but further, that so holding requires us to ignore well-settled precedent.

At common law public employees did not enjoy the right to strike. (*See* James Duff, Jr., Annotation, *Labor Law: Right of Public Employees to Strike or Engage in Work Stoppage*, 37 A.L.R.3d 1147, 1156 (1971) (listing cases in which the common law rule denying public employees the right to strike has been recognized). It is similarly well recognized that, absent judicial or legislative action to the contrary, the common law rule is still binding. *See Anchorage Educ. Ass'n v. Anchorage Sch. Dist.*, 648 P.2d 993, 995–96 (Alaska 1982) (cataloguing decisions prohibiting public employees from striking under the common law absent explicit statutory consent).

There is a long standing aversion to finding that existing common law principles have been implicitly altered by legislative action. This precept is reflected in past decisions of this court when we have held that "[t]he interplay of common law and a subsequent statute on the same subject is governed by well-defined principles. Legislative acts in derogation of the common law will be strictly construed to restrict the provisions to the clear intent of the legislature." *Pigford v. People*, 197 Colo. 358, 360, 593 P.2d 354, 356 (1979) (citing *Board of County Comm'rs of Pitkin County v. Pfeifer*, 190 Colo. 275, 546 P.2d 946 (1976); *Stowell v. People*, 104 Colo. 255, 90 P.2d 520 (1939)). Similarly, we have said that "[i]n the passage of an act it is presumed the legislature is acquainted with the laws of its state which apply to or affect the subject upon which it legislates. It is also presumed that the legislature does not intend to make any change in the existing law beyond what it expressly declares." *Uzzell v. Lunney*, 46 Colo. 403, 418, 104 P. 945, 950 (1909) (citing 2 Sutherland, *Statutory Construction* § 499 (2d ed.)). This rule of statutory construction is echoed in the holdings of many other jurisdictions: "Statutes are not to be understood as effecting any change in the common law beyond that which is clearly indicated." 82 C.J.S. *Statutes* § 363 (1953) (citing cases from 17 jurisdictions in support of this proposition). "Where [a] statute is subject to either construction, construction in conformity with common law, rather than in derogation of common law, should be adopted." *Id.*

In the present case, the majority does not contend that the General Assembly, in passing the 1915 Act, *expressly* changed the common law rule prohibiting public employee strikes. Rather, to the extent that the grant of such a right can be found in the Act, the majority concedes that it can only be found by *implication*. Reading the Act in such a manner is clearly in derogation of the principles of statutory construction set forth above. Thus, I would hold that based on these well recognized principles, we should decline to find that the Act implicitly abolished the common law prohibition on public employee strikes.

Further, I remain unpersuaded by the majority's conclusion that "the act speaks for itself"—even if implicitly—with respect

to the abolition of the common law rule. The majority contends that the Act is clear on this point given the broad definition of employee and employer found in the Act and the provisions regulating the manner in which employees, as defined, may strike. Again, however, I do not think that these facts taken together support the conclusion that the General Assembly unequivocally intended to grant public employees the right to strike. Rather, I think that the question of whether public employees were granted such a right can only be answered by reference to a more fundamental question.

That question is this: Does the fact that the Industrial Relations Act *regulates* the ability of employees to strike lead necessarily to the conclusion that the Act concurrently *grants* public employees such a right? If the answer to this question is yes, then clearly the Act would have implicitly created the right in public employees to strike. If, however, the answer is no, then the Act's application to public employees becomes much more ambiguous.

I can find no precedent to support the conclusion that, in regulating a right which does not exist, the legislature thereby creates that right. It is clear that at common law public employees did not enjoy the right to strike. It is similarly clear that the common law rule had not been abolished either judicially or legislatively prior to 1915. I am unable to see how, in regulating the right of public employees to strike, the legislature implicitly created that right. Rather, I am inclined to think that if the legislature intended to grant such a right to public employees, it would have done so explicitly.[5] Consequently, I cannot agree with the majority that the Act manifests an intent to grant public employees the right to strike.

### B

The teachers next urge that, if the Act did not grant public employees the right to strike, then this court should do so in recognition that the common law rule is no longer justifiable. I would similarly reject this argument, finding that wise judicial discretion dictates that abolition of the common law rule, if indeed warranted, is properly left to the legislative sphere. In so holding, I would approach the question of whether public employees have the right to strike in the same manner as has every other jurisdiction but one, that has addressed this issue.

To date, California is the only state to abolish the common law rule by judicial decision.[6] Courts of other jurisdictions who have been called on to resolve this question have unanimously declined to grant public employees the right to strike absent explicit legislative authorization. *See City of San Diego v. American Fed'n of State, County & Mun. Employees*, 8 Cal.App.3d 308, 87 Cal.Rptr. 258, 260 (1970) (citing cases from 24 jurisdictions declining to grant public employees the right to strike); James Duff, Jr., Annotation, *Labor Law: Right of Public Employees to Strike or Engage in Work Stoppage*, 37 A.L.R.3d 1147, 1156–57 (1971) (listing cases from 21 jurisdictions following this approach). Given the important public policy consideration implicated in granting public employees the right to strike, and the myriad approaches by which such a right could be granted and conditioned, the legislature is undoubtedly the preferred forum for making such determinations.

A survey of the manner in which other jurisdictions have abolished or amended the common law rule by legislative action clearly indicates that this issue is not amenable to judicial resolution. At least 10 states have enacted statutory exceptions to the

---

**5.** This is particularly true in light of the fact that in 1915, no other state in the Union had abolished the common law prohibition on public employee strikes. *See infra* note 7 (first legislative action in this area did not occur until the 1970's). It strains the imagination that the General Assembly would have charted such a novel

course for Colorado, as far back as 1915, by implication.

**6.** *See County Sanitation District No. 2 of Los Angeles County v. Los Angeles County Employees Ass'n, Local 660*, 38 Cal.3d 564, 214 Cal.Rptr. 424, 699 P.2d 835 (1985).

common law rule.[7] The manner in which this has been done, however, varies widely among these jurisdictions—reflecting the wide range of interests and public policy considerations that must be appraised in fashioning such legislation. For example, most statutes prohibit strikes by employees such as police and fire fighters, while others also prohibit security personnel, state retirement system personnel, paramedics, managerial or other "essential" employees whose absence could endanger the public health, safety, and welfare from striking.[8] Some statutes prohibit a public employee union from striking during the term of a valid collective bargaining agreement.[9] Some statutes require that employees be represented by a certified bargaining representative.[10] The statutes differ with respect to when, and according to what standard, an injunction may be sought to proscribe strikes that imperil the public welfare.[11] Other statutes require that the employees engage in a period of mediation and/or arbitration with their employer before a strike is permitted.[12] More generally, the different statutes vary in the extent to which they regulate the collective bargaining process.[13] The differences reflected in these statutes, and the alternatives they represent, clearly indicate that numerous interests and approaches must be evaluated and assessed before any one scheme can responsibly be adopted.

It is my opinion that the record before us is simply too limited to undertake such a task—assuming, that is, that we would otherwise be inclined to change the common law rule. The legislature is better equipped to entertain and investigate the full range of interests involved in addressing the question of whether or not public

**7.** *See* Alaska Stat. § 23.40.200 (1990); Haw.Rev. Stat. § 89–12 (1985); Ill.Ann.Stat. ch. 48, para. 1617 (Smith–Hurd 1986 & 1992 Supp.); Minn. Stat.Ann. § 179A.18 (West 1990); Mont.Code Ann. § 39–31–201 (1991); Ohio Rev.Code Ann. § 4117.14(D) (Page 1991); Or.Rev.Stat. § 243.-726 (1991); Pa.Stat.Ann. tit. 43, § 1101.1001 (1991); Vt.Stat.Ann. tit. 21, § 1730 (1987); Wis. Stat.Ann. § 111.70(4)(cm)(6)(c) (West 1988).

**8.** *See* Alaska Stat. § 23.40.200(b) (1990) (prohibiting police, fire, correctional facility and hospital facility employees from striking); Haw.Rev. Stat. § 89–12(a)(3) (1985) (prohibiting "essential" employees from striking); Ill.Ann.Stat. ch. 48, para. 1617(a) (Smith Hurd 1986 & 1992 Supp.) (prohibiting security employees, state peace officers, fire fighters and paramedics from striking); Minn.Stat.Ann. § 179A.18, subd. 1 (West 1990) (prohibiting "confidential, essential, and managerial" employees from striking); Ohio Rev.Code Ann. § 4117.14(D)(1) (Page 1991) (prohibiting police, fire, emergency or medical personnel, employees of the state schools for the deaf and blind, employees of the state retirement system, correctional officials, and penal or mental institution employees from striking); Or.Rev.Stat. § 243.736 (1991) (prohibiting police officers, fire fighters, guards at correctional or mental institutions, and emergency telephone workers from striking); Pa.Stat.Ann. tit. 43, §§ 1101.1001 & 1101.301(2) (1991) (prohibiting prison and mental hospital guards, court employees, elected officials, Governor's appointees, clergy, police officers and fire fighters from striking); Wis.Stat.Ann. § 111.-70(1)(nm) (West 1988) (prohibiting fire fighters and law enforcement personnel from striking).

**9.** *See* Ill.Ann.Stat. ch. 48, para. 1617(a)(2) (Smith–Hurd 1986 & 1992 Supp.); Minn.Stat. Ann. § 179A.18, subd. 1(1)(a) (West 1990).

**10.** *See* Haw.Rev.Stat. § 89–12(a)(1) (1985); Ill. Stat. ch. 48, para. 1617(a)(1) (Smith–Hurd 1986 & 1992 Supp.); Minn.Stat.Ann. § 179A.18 subd. 1(1)(b) (West 1990); Or.Rev.Stat. § 243.726(1) (1991).

**11.** *See* Haw.Rev.Stat. § 89–12(c)(1) (1985) (proscribing strikes in the case of an "imminent or present danger to health or safety of the public" that "is about to occur or is in progress"); Ill. Ann.Stat. ch. 48, para. 1713 (Smith–Hurd 1986 & 1992 Supp.) (relief if a clear and present danger to health or safety); Ohio Rev.Code Ann. § 4117.16(A) (Page 1991) (clear and present danger); Pa.Stat.Ann. tit. 43, § 1101.1003 (1991) (clear and present danger); Vt.Stat.Ann. tit. 21, § 1730 (1987) (prohibiting strikes that would endanger the public, health, safety, or welfare).

**12.** *See* Alaska Stat. § 23.40.200(c) (1990) (requiring mediation for employees whose services may be interrupted for a limited time); Haw. Rev.Stat. § 89–12(b) (1985) (requiring mediation, factfinding, arbitration, and notice of intent to strike); Ill.Ann.Stat. ch. 48, para. 1617(a)(4) (Smith–Hurd Supp.1986) (requiring mediation or conciliation); Minn.Stat.Ann. § 179A.18 subd. 1(1)(b) (West 1990) (requiring mediation for at least 45 days); Or.Rev.Stat. § 243.726(2)(a) (1991) (requiring mediation and factfinding); Pa.Stat.Ann. tit. 43, § 1101.1003 (1991) (requiring mediation); Wis.Stat.Ann. § 111.70(4)(cm)(6)(c) (West 1988) (requiring mediation and arbitration).

**13.** *See generally supra* note 7.

employees ought to be granted the right to strike and if so, on what terms.

Resolution of the differences between my views and those of the majority can easily be reached. If the General Assembly is of the view that the majority opinion faithfully interprets the legislative intent of the Act, then no action need be taken and public employee strikes subject to certain restrictions will be permissible. On the other hand, if the General Assembly does not agree with the conclusion reached in the majority opinion, appropriate legislation will remedy the matter.

Accordingly, I respectfully dissent.

I am authorized to say that Justice LOHR joins in this dissent.

Justice ERICKSON dissenting:

The threshold question before us is whether the 1981 strike by public school teachers in the Montezuma–Cortez school district was illegal. The underlying issue is whether public employees in Colorado have the right to strike.

I disagree with the majority's central holding that public-sector employees have a qualified right to strike subject to explicit executive and judicial controls. I dissent because I believe that the common-law rule prohibiting strikes by public employees controls the right-to-strike issue. Accordingly, I would affirm the court of appeals decision that the strike was illegal. *Mar-*

tin v. Montezuma–Cortez Sch. Dist. RE–1, 809 P.2d 1010 (Colo.Ct.App.1990).

Under the common law, public employee strikes were prohibited. *See Anchorage Educ. Ass'n v. Anchorage Sch. Dist.*, 648 P.2d 993, 995–96 (Alaska 1982) (cataloguing decisions prohibiting public employees from striking under the common law absent explicit statutory consent); James Duff, Jr., Annotation, *Labor Law: Right of Public Employees to Strike or Engage in Work Stoppage*, 37 A.L.R.3d 1147, 1156 (1971) (recognizing common-law rule denying public employees the right to strike).

Colorado has not judicially abrogated the common-law rule prohibiting public employee strikes. The dispositive issue before us is whether the General Assembly has legislatively revoked or changed the common-law rule.

In 1889, the General Assembly enacted section 8–2–101, 3B C.R.S. (1986).[1] On its face, this section did not grant employees an affirmative right to strike.[2] Rather, section 8–2–101 was intended to eliminate the threat of criminal conspiracy in labor disputes.[3] The majority does not contend that section 8–2–101 established a statutory right to strike for public employees.

Instead, the majority holds that the General Assembly abrogated the common-law rule in 1915 with the adoption of what the majority terms the "Industrial Relations Act." The majority examines the language of the "Industrial Relations Act" and concludes from the definitions of employee[4]

---

1. Section 8–2–101 provides:
    **Combination of employees of peaceable objects lawful.** It is not unlawful for any two or more persons to unite, combine, or agree in any manner, to advise or encourage, by peaceable means, any persons to enter into any combination in relation to entering into or remaining in the employment of any person or corporation, or in relation to the amount of wages or compensation to be paid for labor, or for the purpose of regulating the hours of labor, or for the procuring of fair and just treatment from employers, or for the purpose of aiding and protecting their welfare and interests in laws made in pursuance thereof. This section shall not be so construed as to permit two or more persons, by threats of either bodily or financial injury, continuing in such employment as he may see fit, or to boycott or intimidate any employer of labor.

2. Section 8–2–101 does not mention the term "strike" or "concerted action." The purpose of this section was to make the acts of organization and combination lawful.

3. Criminal conspiracy was one of the main weapons management used against unions in the late nineteenth century. *Bureau of Labor Statistics of the State of Colorado, First Biennial Report*, at 43–53 (1887–1888). Section 8–2–101 eliminated this obstacle to union activities.

4. The definition of employee included, "every person in the service of the state or of any county, city, town, irrigation or school district therein, or of any public institution or administrative board thereof...." Ch. 180, sec. 4(d), 1915 Colo.Sess.Laws 562, 563.

and employer[5] and the grant of power to the Colorado Industrial Commission[6] that the act "[b]y its definitions ... grant[ed] the right to strike to all employees, private and public...." Maj. op. at 247. I do not believe that the statute created such an implied right to strike for public employees.

In my view, the statute enacted by the General Assembly in 1915 did not abrogate or change the common-law rule prohibiting strikes by public employees. I disagree with the majority's analysis of the 1915 statute and would hold that the plain language does not establish a right to strike for public employees.

If the language of the statute is clear and unambiguous, there is no need to resort to interpretive rules of statutory construction. *Bloomer v. Board of County Comm'rs*, 799 P.2d 942, 944 (Colo.1990). A court should look first to the plain language of the statute and the words used should be given effect according to their plain and ordinary meaning. *Farmer's Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991).

In my view, the original name of the act, the "Industrial Commission of Colorado" Act, provides a more accurate reference for the statute enacted in 1915.[7] The plain language of the Industrial Commission Act did not grant public employees the right to strike. The statute did not affirmatively grant the right to strike or to engage in "concerted activities."[8]

Moreover, it was not the purpose of the General Assembly to create a right to strike for public employees. Rather, the sole purpose of the General Assembly in enacting the 1915 statute was to establish the Colorado Industrial Commission.[9]

---

**5.** The definition of employer included, "[t]he state, and each county, city, town, irrigation and school district therein, and all public institutions and administrative boards thereof." Ch. 180, sec. 4(c)I, 1915 Colo.Sess.Laws 562, 563.

**6.** The commission was granted the power "to promote the voluntary arbitration, mediation and conciliation of disputes between employers and employees, and to avoid the necessity of resorting to strikes, lockouts, boycotts, blacklists, discrimination and legal proceedings in matters of employment." Ch. 180, sec. 27, 1915 Colo.Sess.Laws 562, 577.

**7.** Chapter 180 was one of a series of acts entitled "Workmen's Compensation Acts." Chapter 179 contained no subtitle. The stated purpose of this act was

[t]o determine and define the relations between employer and employee, providing for safe and hygienic conditions and for compensation for accidental injury to or death of employees; for insurance of such compensation; establishing an industrial commission, prescribing its powers, and providing for review of its proceedings; making an appropriation to carry out the provisions of this act; providing penalties for violation of this act; repealing all acts and parts of acts in conflict with this act, and declaring this act to be necessary for the immediate preservation of public peace, health, and safety.

Ch. 179, 1915 Colo.Sess.Laws 515.

Chapter 180 was subtitled "Industrial Commission of Colorado." The stated purpose of Chapter 180 duplicated the language of Chapter 179. *See* Ch. 180, 1915 Colo.Sess.Laws 562. The substance of Chapter 180 and subsequent amendments is currently codified at section 8–1–101, 3B C.R.S. (1986) to section 8–1–151, 3B C.R.S. (1986), and is entitled, "Division of Labor—Industrial Claim Appeal Office."

**8.** *Cf.* § 8–3–106, 3B C.R.S. (1986) (specifically granting private employees an affirmative right to engage in "concerted activities" under the Labor Peace Act); 29 U.S.C. § 157 (1988) (providing a federal right to "engage in concerted activities" under the National Labor Relations Act).

**9.** In *People v. United Mine Workers*, 70 Colo. 269, 201 P. 54 (1921), we examined the legislative history of these acts and stated:

It would seem that House Bill 177 and Senate Bill 99 were identical, that each was cut in two, that which was cut from one remaining in the other. The latter emerged as chapter 179, providing workmen's compensation, and the former as chapter 180 of the acts of 1915, establishing an industrial commission to administer and enforce the other, each with amendments of more or less importance, but none which altered the original purpose. That was and continued to be to provide for workmen's compensation and an industrial commission.

That the purpose of the General Assembly in passing the two bills was the purpose of the original bill there can be no doubt. What would have been the effect if one had passed and the other had failed, we are not now called upon to say. It is enough to say that, after all the amendments, the final passage of the two amended bills effected the purpose of the original.

*Id.* at 273–74, 201 P. at 56. In *United Mine Workers* and the subsequent cases analyzing the 1915 statute, we have never suggested that the

If the majority's analysis is correct, the Industrial Commission Act legalized all public employee strikes. Public employees include not just school teachers and janitors, but also firemen and policemen. I do not believe that the General Assembly intended to legalize strikes for all public employees in direct contradiction to the established common-law rule, absent express legislative direction. *Anchorage Educ. Ass'n v. Anchorage Sch. Dist.*, 648 P.2d 993, 995–96 (Alaska 1982) (finding no jurisdiction permitting public employees to legally strike absent explicit statutory consent). Because express legislative direction is absent, I would not find an implied right to strike for public employees within the confines of the statute establishing the Colorado Industrial Commission.

Accordingly, I would hold that court of appeals correctly found that the strike was illegal under the common-law prohibition of strikes by public employees. In my view, the General Assembly's enactment of the Industrial Commission Act in 1915 did not create an implied right to strike for public employees.

I am authorized to say that Justice LOHR joins in this dissent.

General Assembly intended to create a right to strike for public employees.

The primary purpose of the 1915 statute was, as the name indicates, to establish the Colorado Industrial Commission. *See* John A. Criswell, *Collective Bargaining for Local Public Employees in Colorado,* 8 Colo.Law. 2123, 2138 (1979) (noting that the statute's purpose was "to provide machinery for the peaceful resolution of all labor disputes by establishing a process which today would be described as 'factfinding' "). Creating a right to strike for public employees is not mentioned in the paragraph describing the act's purpose.